[Cite as *CT Ohio Portsmouth, L.L.C. v. Ohio Dept. of Medicaid*, 2020-Ohio-5091.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| CT Ohio Portsmouth, LLC, d/b/a Portsmouth Health and Rehab, | : | |
| | : | |
| Plaintiff-Appellee/ Cross-Appellant, | : | |
| | | No. 19AP-588 |
| v. | : | (C.P.C. No. 19CV-1982) |
| The Ohio Department of Medicaid et al., | : | (REGULAR CALENDAR) |
| | | |
| Defendants-Appellants/ Cross-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on October 29, 2020

**On brief:** *Rolf Goffman Martin Lang, LLP, Christopher G. Kuhn*, and *Joseph F. Petros, III*, for appellee. **Argued:** *Joseph F. Petros, III.*

**On brief:** *Dave Yost*, Attorney General, and *Theresa R. Dirisamer*, for appellants. **Argued:** *Theresa R. Dirisamer.*

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendants-appellants/cross-appellees Ohio Department of Medicaid ("ODM") and the Director of ODM, Maureen M. Corcoran (collectively "appellants") appeal a judgment of the Franklin County Court of Common Pleas overruling appellants' objections to a magistrate's decision and entering judgment in favor of plaintiff-appellee/cross-appellant, CT Ohio Portsmouth, LLC, d/b/a/ Portsmouth Health and Rehab ("Portsmouth"), on its claims that R.C. 5165.771 violates the due process protections of the Ohio Constitution and the United States Constitution and that appellants were not authorized to terminate Portsmouth's participation in Ohio's Medicaid program until

April 19, 2019 pursuant to R.C. 5165.771(B)(3). Portsmouth filed a cross-appeal of the common pleas court judgment, which also overruled Portsmouth's objections to the magistrate's decision and entered judgment in favor of appellants on Portsmouth's claim that R.C. 5165.771 violates the constitutional non-delegation doctrine and that appellants were not authorized to terminate Portsmouth's participation in Ohio's Medicaid program until May 31, 2019 pursuant to R.C. 5165.771(D). Portsmouth has also moved to dismiss the appeal, arguing it has been rendered moot by subsequent events. For the following reasons, we deny Portsmouth's motion to dismiss and affirm in part and reverse in part the judgment of the common pleas court.

## I. Facts and Procedural History

{¶ 2} Portsmouth operates a skilled nursing facility in Portsmouth, Ohio, named Portsmouth Health and Rehab. This appeal arises from an action filed to prevent appellants from terminating Portsmouth's participation in the Ohio Medicaid program.

{¶ 3} Prior to May 1, 2018, the facility now known as Portsmouth was operated by Pristine Senior Living of Portsmouth, LLC, and known as Pristine Senior Living & Post Acute Care of Portsmouth ("Pristine"). Pristine entered into a Medicaid provider agreement with ODM in 2015. On March 8, 2018, the Ohio Department of Health ("ODH") issued a letter advising Pristine it had been selected for the Special Focus Facility ("SFF") program. The Federal Centers for Medicare and Medicaid Services ("CMS") published an SFF list on April 19, 2018 identifying Pristine as a facility that was newly added to the SFF program.

{¶ 4} On May 1, 2018, Portsmouth took over operations of Pristine and renamed the facility. Portsmouth entered into a new Medicaid provider agreement with ODM effective May 1, 2018. On February 15, 2019, ODM advised Portsmouth it intended to terminate Portsmouth's Medicaid provider agreement as of March 9, 2019 pursuant to R.C. 5165.771(B)(3).

{¶ 5} On March 7, 2019, Portsmouth filed a complaint in the common pleas court seeking declaratory and injunctive relief. Portsmouth sought a temporary restraining order, preliminary injunction, and permanent injunction prohibiting appellants from enforcing R.C. 5165.771 and terminating Portsmouth's Medicaid provider agreement. Portsmouth's complaint asserted five counts: (1) R.C. 5165.771 violated Article I, Section 16,

of the Ohio Constitution, (2) R.C. 5165.771 violated the Fifth and Fourteenth Amendments to the United States Constitution, (3) R.C. 5165.771 violated the non-delegation doctrine of the Ohio and United States Constitutions, (4) appellants violated R.C. 5165.771(B)(3) by attempting to terminate Portsmouth's Medicaid provider agreement earlier than allowed under the statute, and (5) appellants violated R.C. 5165.771(D) by attempting to terminate Portsmouth's Medicaid provider agreement before the Ohio Department of Aging provided four months of technical assistance to Portsmouth. An agreed temporary restraining order was entered the day the complaint was filed, prohibiting appellants from enforcing R.C. 5165.771 against Portsmouth and terminating its provider agreement. A magistrate of the common pleas court conducted a hearing on the complaint on March 28, 2019. The agreed temporary restraining order was extended until the magistrate issued a decision.

{¶ 6} The magistrate concluded R.C. 5165.771 was facially unconstitutional because it violated the due process protections provided under the Ohio Constitution and the United States Constitution by denying nursing facilities continued participation in the Medicaid program without due process of law. The magistrate further concluded R.C. 5165.771 did not violate the constitutional non-delegation doctrine. The magistrate found appellants were not authorized to terminate Portsmouth from the Medicaid program until April 19, 2019, and terminating Portsmouth's provider agreement prior to that date would violate R.C. 5165.771(B)(3). The magistrate also found appellants did not violate the statute by seeking to terminate Portsmouth from the Medicaid program before the Ohio Department of Aging had provided four months of technical assistance as required under R.C. 5165.771(D). Finally, the magistrate concluded Portsmouth was entitled to a permanent injunction prohibiting enforcement of R.C. 5165.771.

{¶ 7} Appellants and Portsmouth submitted objections to the magistrate's decision. The common pleas court issued a judgment overruling all objections and adopting the magistrate's decision. The court entered judgment in favor of Portsmouth on its first and second claims for relief, holding R.C. 5165.771 violated the due process protections of the Ohio Constitution and United States Constitution, and on its fourth claim for relief, holding appellants violated R.C. 5165.771(B)(3) by seeking to terminate Portsmouth's Medicaid provider agreement prior to April 19, 2019. The court entered judgment in favor of appellants on Portsmouth's third claim for relief, finding R.C. 5165.771

did not violate the constitutional non-delegation doctrine, and its fifth claim for relief, finding appellants did not violate R.C. 5165.771(D). The common pleas court permanently enjoined appellants from enforcing R.C. 5165.771 and terminating Portsmouth from the Medicaid program under that statute.

## II. Assignments of Error

{¶ 8} Appellants appeal and assign the following three assignments of error for our review:

> [I.] The trial court erred in finding that R.C. 5165.771, on its face, violates procedural due process under the Ohio and United States Constitutions.
>
> [II.] The trial court erred in finding that R.C. 5165.771 did not authorize Defendant-Appellants to terminate Plaintiff-Appellee's participation in the Medicaid program until April 19, 2019.
>
> [III.] The trial court erred in granting permanent injunctive relief.

{¶ 9} Portsmouth filed a cross-appeal and assigns the following sole assignment of error for our review:

> The trial court erred in finding that R.C. 5165.771 does not violate the non-delegation doctrine.

## III. Analysis

## A. Background on Medicaid and the SFF Program

{¶ 10} Medicaid, which provides joint federal and state funding for medical care for individuals who cannot afford to pay medical costs, began in 1965 with the enactment of Title XIX of the Social Security Act. *Arkansas Dept. of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). On the federal level, Medicaid is administered by the Secretary of the Department of Health and Human Services, who exercises authority through CMS. *Ahlborn*. Although states are not compelled to participate in Medicaid, all states have chosen to join the program. *Id.* ODM is the agency charged with supervising the Medicaid program in Ohio. R.C. 5162.03. An operator of a nursing facility in Ohio may enter into a provider agreement to receive Medicaid payments for services provided to Medicaid-eligible residents if: (1) the nursing facility is certified by the Director of ODH for

participation in Medicaid, (2) the nursing facility is licensed by the Director of ODH as a nursing home, if required by law, and (3) both the operator and the nursing facility comply with all applicable state and federal laws and rules.  R.C. 5165.06.

**1. Supervision of nursing facilities in the Medicaid program**

{¶ 11} Each state is responsible for certifying that nursing facilities are in compliance with the requirements of law by performing inspections, referred to as "surveys."   42 U.S.C. 1395i-3(g)(1)(A) and 1396r(g)(1)(A). Under federal law, a regular "standard survey" of each facility must be conducted at least once every 15 months.  42 U.S.C. 1395i-3(g)(2)(A) and 1396r(g)(2)(A).  Facilities found to have provided substandard care are subject to further extended surveys. 42 U.S.C. 1395i-3(g)(2)(B) and 1396r(g)(2)(B). In Ohio, ODH conducts surveys of nursing facilities in accordance with federal and state regulations, guidelines, and procedures.  R.C. 5165.64.

{¶ 12} A facility's failure to meet a requirement under the law is referred to as a "deficiency."  *See* 42 C.F.R. 488.301; R.C. 5165.60(D)(1).  Deficiencies are graded by scope and severity, and can be grouped into four categories: (1) deficiencies that pose no actual harm with potential for minimal harm ("A," "B," or "C" deficiencies), (2) deficiencies that pose no actual harm with potential for more than minimal harm that is not immediate jeopardy ("D," "E," or "F"), (3) deficiencies that constitute actual harm that is not immediate jeopardy ("G," "H," or "I"), and (4) deficiencies that represent immediate jeopardy to resident health or safety ("J," "K," or "L"). A facility is deemed to be in substantial compliance with Medicaid requirements when any identified deficiencies are no greater than category C.  After being notified of a deficiency, a facility is given ten days to submit a plan of correction describing the actions that will be taken to correct each deficiency and the date by which the deficiency will be corrected.  42 C.F.R. 488.401, 488.402(d), and 488.408(f); R.C. 5165.69(A).  After a plan of correction is approved, ODH will revisit the facility to determine whether it is in compliance.  R.C. 5165.85(A).

{¶ 13} A facility may challenge a deficiency finding through an informal dispute resolution ("IDR") process.  42 C.F.R. 488.331; Ohio Adm.Code 3701-63-02.  There are two levels of IDR review: (1) review by an ODH surveyor who was not involved in the facility's survey, and (2) review by an ODH hearing officer.  Ohio Adm.Code 3701-63-02(E)(1) through (3).  In a first-level review, the facility can submit additional documentation with

the request for review and the surveyor may change the scope and severity of the deficiency findings. In a second-level review, the hearing officer reviews the first-level review decision and makes a recommendation. No new evidence or documentation is considered in the second-level review.

## 2. SFF program

{¶ 14} The SFF program was instituted in 2010 as part of the Patient Protection and Affordable Care Act. Public Law 111-148, 124 Stat. 119, 707-10 (Mar. 23, 2010). The program is intended to enforce the requirements of law for nursing facilities that have been identified as substantially failing to meet those requirements. 42 U.S.C. 1395i-3(f)(8)(A) and 1396r(f)(10)(A). Facilities in the SFF program must be surveyed at least twice a year. 42 U.S.C. 1395i-3(f)(8)(B) and 1396r(f)(10)(B). The SFF program is administered by CMS by policy memorandum. Under the most recently issued policy memorandum, Ohio is required to place five nursing facilities into the SFF program. CMS compiles a list of candidates for inclusion on the SFF list. When there is an opening in the program, ODH recommends a facility from the candidate list and CMS has final approval over placement of the facility in the SFF program. Nursing facilities do not have hearing or appeal rights related to placement on the SFF candidate list or placement in the SFF program.

{¶ 15} CMS generally updates and releases the SFF list on a monthly basis, designating facilities into one of five groups: (1) Table A, listing facilities that are newly added to the SFF list, (2) Table B, listing facilities that have not improved, (3) Table C, listing facilities that have shown improvement, (4) Table D, listing facilities that have recently graduated from the program, and (5) Table E, listing facilities that are no longer in Medicare and Medicaid. Under R.C. 5165.771(B), ODM is required to terminate a nursing facility's participation in Medicaid if the facility is placed in Table A and fails to be moved into Table C (indicating improvement) within 12 months or into Table D (indicating graduation from the program) within 24 months. In this case, ODM indicated it intended to terminate Portsmouth's Medicaid provider agreement because it had not been moved into Table C within 12 months of being placed in the SFF program.

## 3. Portsmouth's participation in the SFF program

{¶ 16} ODH notified Pristine on March 8, 2018 that it had been selected for the SFF program ("SFF notification letter"). The SFF notification letter advised Pristine it would be

subject to at least one standard survey every six months while it was in the SFF program. The SFF notification letter further advised that Pristine could graduate from the SFF program once it completed two consecutive standard surveys with no deficiencies of "F" or greater. The SFF notification letter indicated if Pristine remained in the SFF program after three standard surveys, it would be afforded a "last chance survey" prior to termination. The SFF notification letter did not refer to the potential for termination of Pristine's Medicaid provider agreement, pursuant to R.C. 5165.771, if it failed to demonstrate improvement or graduate from the SFF program.

{¶ 17} CMS published the monthly list of SFF program facilities on March 15, 2018. Notwithstanding the SFF notification letter having been issued seven days earlier, Pristine was not listed in any of the SFF tables that were published on March 15, 2018. Pristine first appeared in the SFF tables in the list published by CMS on April 19, 2018, where it was listed in Table A, designating facilities newly added to the SFF program. The data included in the April 19, 2018 tables indicated Pristine had been in the SFF program for one month.

{¶ 18} No standard surveys of Pristine were conducted between notification of selection for the SFF program and May 1, 2018, when Portsmouth took over operations. Portsmouth was subjected to two standard surveys between May 2018 and February 2019. The first standard survey was conducted August 3, 2018 ("August 2018 standard survey"), resulted in a finding of two "G" deficiencies. Portsmouth did not request IDR review after the August 2018 standard survey. Portsmouth submitted a plan of correction and asserted it was in substantial compliance by correcting the cited deficiencies; ODH revisited Portsmouth following the August 2018 standard survey and confirmed it was in substantial compliance with the law as of August 29, 2018. The second standard survey was conducted January 16, 2019 ("January 2019 standard survey"), and resulted in a finding of four "F" deficiencies and one "G" deficiency. Portsmouth requested IDR review after the January 2019 standard survey. Following two levels of IDR review, Portsmouth was found to have three "F" deficiencies and one "G" deficiency as a result of the January 2019 standard survey. Portsmouth again submitted a plan of correction and asserted it was in substantial compliance by correcting the cited deficiencies; ODH revisited Portsmouth following the January 2019 standard survey and confirmed it was in substantial compliance with the law as of February 15, 2019.

{¶ 19} On February 15, 2019, ODM advised Portsmouth it intended to terminate Portsmouth's Medicaid provider agreement, effective March 9, 2019, pursuant to R.C. 5165.771(B)(3), because Portsmouth would not be placed in Table C of the SFF list within 12 months of having been placed in Table A of the SFF list. During the period after the January 2019 standard survey, CMS published the list of SFF program facilities on February 21, and again on March 21, 2019. Portsmouth was listed in Table B, designating facilities that had not improved, in both of those lists. The parties stipulated that neither Pristine nor Portsmouth was ever listed in Table C or D of the SFF program list. Portsmouth filed its complaint on March 7, 2019 seeking to prevent appellants from terminating its participation in the Medicaid program.

## B. Portsmouth's Motion to Dismiss Appeal

{¶ 20} Portsmouth has moved to dismiss this appeal, arguing that if appellants prevail and subsequently terminate Portsmouth from the Medicaid program, Portsmouth would be legally entitled to immediate reinstatement in the program. Portsmouth asserts this renders the appeal moot because there would be no practical effect from this court's judgment. Appellants argue the appeal is not moot because the common pleas court found R.C. 5165.771 to be facially unconstitutional. Therefore, irrespective of the impact as applied to Portsmouth, the trial court's ruling precludes termination of *any* nursing facility's participation in the Ohio Medicaid program under R.C. 5165.771. Appellants also dispute Portsmouth's assertion that it would be automatically entitled to immediate reinstatement in the Medicaid program if it was terminated following a decision in appellants' favor. Before addressing the merits of the appeal and cross-appeal, we must consider Portsmouth's motion to dismiss.

{¶ 21} "The doctrine of mootness is rooted both in the 'case' or 'controversy' language of Section 2, Article III of the United States Constitution and in the general notion of judicial restraint. While Ohio has no constitutional counterpart to Section 2, Article III, the courts of Ohio have long recognized that a court cannot entertain jurisdiction over a moot question. It is not the duty of a court to decide purely academic or abstract questions." (Internal citations omitted.) *James A. Keller, Inc. v. Flaherty*, 74 Ohio App.3d 788, 791 (10th Dist.1991). "No actual controversy exists where a case has been rendered moot by an outside event." *Tschantz v. Ferguson*, 57 Ohio St.3d 131, 133 (1991). "When a case becomes

moot, dismissal of the case is appropriate because the case no longer presents a justiciable controversy." *Rithy Properties, Inc. v. Cheeseman*, 10th Dist. No. 15AP-641, 2016-Ohio-1602, ¶ 14.

{¶ 22} One exception to the mootness doctrine arises when a case presents a debatable constitutional question or matter of great public or general interest. *Franchise Developers, Inc. v. Cincinnati*, 30 Ohio St.3d 28, 31 (1987). The common pleas court judgment in this case found that R.C. 5165.771 violated both the Ohio Constitution and the United States Constitution. The court concluded that "Ohio Revised Code section 5165.771 is an unconstitutional statute on its face that violates the guarantees of due process of law, which require the procedural process of notice and of opportunity to be heard, of Section 16, Article I of the Ohio Constitution." (Decision at 8.) The court also concluded that "Ohio Revised Code section 5165.771 is an unconstitutional statute on its face that violates the guarantees of due process of law, which require the procedural process of notice and of opportunity to be heard, of the Fifth and Fourteenth Amendments to the United States Constitution." (Decision at 8.) Pursuant to these conclusions, the court permanently enjoined appellants from enforcing R.C. 5165.771.[1] Because the trial court concluded the statute was facially unconstitutional, appellants are prohibited from enforcing the statute against *any* nursing home. Therefore, notwithstanding Portsmouth's assertion that the outcome of the appeal will have no practical effect on its participation in the Medicaid program, we conclude this appeal presents a constitutional question. *See Smith v. Leis*, 106 Ohio St.3d 309, 2005-Ohio-5125, ¶ 15 ("This appeal presents a properly debatable constitutional issue, i.e., whether Section 9, Article I of the Ohio Constitution, as amended, authorizes cash-only bail."); *In re Annexation of 2.33 Acres*, 11th Dist. No. 99-T-0024 (June 16, 2000) ("Once annexation proceedings have been completed, the issue as to whether to enjoin an annexation is moot. However, this appeal does not solely seek to enjoin the annexation, it also seeks to have the statutory process by which the annexation

---

[1] With respect to the trial court's issuance of a permanent injunction, we further note the Supreme Court of Ohio denied a motion to dismiss an appeal in a case where a permanent injunction prohibited a county solid waste management district from entering a contract with a private vendor, holding that "[s]o long as that injunction remains in effect, a real, justiciable controversy exists between the parties which is neither merely academic nor abstract." *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.*, 73 Ohio St.3d 590, 598 (1995).

was completed decreed unconstitutional. Therefore, the appeal is not moot."). (Internal citations omitted.)

{¶ 23} Portsmouth urges us not to apply this exception to the mootness doctrine in this case, citing decisions from this court referring to the narrow construction and rare application of the exception. However, those cases generally involve application of the "great public or general interest" exception to mootness, not the "debatable constitutional question" exception. *See, e.g., Sims v. Nissan N. Am., Inc.*, 10th Dist. No. 14AP-975, 2015-Ohio-5575, ¶ 13 ("[I]n several decisions, this court has narrowly construed the 'great public or general interest' exception to the mootness doctrine."); *Robinson v. Indus. Comm.*, 10th Dist. No. 04AP-1010, 2005-Ohio-2290, ¶ 10 ("Appellant also claims that his case may be heard because it involves issues that concern a matter of great public or general interest. This exception to the mootness doctrine should be used with caution and only on rare occasions."). The cautionary language in many of those cases derives from this court's decision in *Harshaw v. Farrell*, 55 Ohio App.2d 246, 251 (10th Dist.1977):

> On rare occasions, the court may retain an otherwise moot action for determination when it involves an issue of great public importance so that the question can be properly determined on its merits. See *McDuffie v. Berzzarine* (1975), 43 Ohio St. 2d 23. Ordinarily, however, it is only the highest court of the state that adopts this procedure rather than a court whose decision does not have binding effect over the entire state, as would be true if a Common Pleas Court rules upon a case which is otherwise moot.

Thus, the cautionary language in the cases Portsmouth cites does not apply with equal force when a case presents a constitutional question, as in the present appeal.

{¶ 24} Because we find this appeal presents a debatable constitutional question even if there is no justiciable controversy remaining between the parties, we deny Portsmouth's motion to dismiss the appeal as moot.

**C. General Standard of Review**

{¶ 25} Having denied Portsmouth's motion to dismiss, we turn to the merits of the appeal and cross-appeal.

{¶ 26} Appellants and Portsmouth appeal from a decision of the common pleas court denying the parties' objections and adopting the magistrate's decision. A trial court considering objections to a magistrate's decision must undertake an independent review of

the matters objected to and ascertain whether the magistrate has properly determined the factual issues and appropriately applied the law. Civ.R. 53(D)(4)(d). Therefore, a trial court applies a de novo standard in reviewing objections to a magistrate's decision. *James v. My Cute Car, LLC*, 10th Dist. No. 16AP-603, 2017-Ohio-1291, ¶ 13. "The standard of review on appeal from a trial court judgment that adopts a magistrate's decision varies with the nature of the issues that were (1) preserved for review through objections before the trial court and (2) raised on appeal by assignment of error." *In re Guardianship of Schwarzbach*, 10th Dist. No. 16AP-670, 2017-Ohio-7299, ¶ 14.

## D. Portsmouth's Procedural Due Process Challenges to R.C. 5165.771

{¶ 27} Appellants assert in their first assignment of error that the common pleas court erred by finding R.C. 5165.771 to be facially unconstitutional in violation of the procedural due process protections of the Ohio Constitution and the United States Constitution. "When reviewing the constitutionality of statutes, we are guided by the presumption that enactments of the General Assembly are constitutional." *Libertarian Party of Ohio v. Husted*, 10th Dist. No. 16AP-496, 2017-Ohio-7737, ¶ 31, citing *State v. Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, ¶ 10. The party challenging the statute must prove beyond a reasonable doubt that it is clearly incompatible with the relevant constitutional provisions. *Husted* at ¶ 31. When asserting a statute to be facially unconstitutional, the challenger must establish that no set of circumstances exists under which the statute would be valid. *Wymsylo v. Bartec, Inc.*, 132 Ohio St.3d 167, 2012-Ohio-2187, ¶ 21. If a statute is facially unconstitutional, it may not be enforced under any circumstances. *Wymsylo*. Courts must liberally construe statutes to avoid conflicts with the constitution; however, where a statute and a constitutional provision are clearly incompatible, courts have a duty to declare the statute unconstitutional. *Husted* at ¶ 31. The constitutionality of a statute is a question of law, which we review de novo on appeal. *Youngstown City School Dist. Bd. of Edn. v. Ohio*, 10th Dist. No. 17AP-775, 2018-Ohio-2532, ¶ 10.

{¶ 28} Portsmouth's complaint alleged that R.C. 5165.771 violated the due process protections of the United States Constitution and the Ohio Constitution. The Fifth Amendment to the United States Constitution provides in relevant part that "[n]o person shall * * * be deprived of life, liberty, or property, without due process of law." The

Fourteenth Amendment to the United States Constitution provides, in relevant part, that no state shall "deprive any person of life, liberty, or property, without due process of law." Article I, Section 16 of the Ohio Constitution similarly states that "every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law." The Supreme Court of Ohio has held that the Due Course Clause of Article I, Section 16 of the Ohio Constitution is coextensive with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *State v. Anderson*, 148 Ohio St.3d 74, 2016-Ohio-5791, ¶ 21.

{¶ 29} The requirements of procedural due process only apply to protected liberty and property interests. *Busy Bee Nursery & Preschool, Inc. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 15AP-1036, 2018-Ohio-1158, ¶ 11. Therefore, the first step in a due process challenge is determining whether the plaintiff has been deprived of a protected interest in liberty or property. *Id.* Where a protected liberty or property interest has been deprived, then we proceed to the second step of determining whether the state's procedures complied with due process. *Id.*

1. **Does Portsmouth have a protected property interest in continued participation in Medicaid?**

{¶ 30} Property interests are not created by the Constitution; "[r]ather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). A person must have more than an abstract need or unilateral expectation of a benefit to have a property interest in it—"[h]e must, instead, have a legitimate claim of entitlement to it." *Roth*. A statutory entitlement may give rise to a property interest subject to due process protection. *Brookpark Entertainment, Inc. v. Taft*, 951 F.2d 710, 714 (1991).

a. **Effect of *Barry* and *Somani* on this appeal**

{¶ 31} The common pleas court adopted the magistrate's conclusion that Portsmouth had a constitutionally protected property interest in continued participation in the Medicaid program based on the Supreme Court's decision in *Ohio Academy of Nursing Homes, Inc. v. Barry*, 56 Ohio St.3d 120 (1990), and this court's decision in *S. Health*

*Facilities v. Somani*, 10th Dist. No. 95APE06-826 (Dec. 29, 1995). In *Barry*, a nursing home filed a class action complaint challenging an amendment to Ohio's Medicaid regulations that reduced the reimbursement rate for nursing homes. *Barry* at 122. The nursing homes argued the regulatory change violated federal law. They also argued the process by which the regulatory amendment was adopted violated their rights to procedural due process. *Id.* at 125. The Supreme Court concluded the nursing homes established they had a property interest in receiving reimbursements from the state that could not be diminished without due process of law. *Id.* at 126-27. In its discussion of the nursing homes' property interest, the *Barry* decision cited federal cases holding that a Medicaid provider has a property interest in continued participation in the Medicaid program. *Id.* at 126, citing *Wayside Farms, Inc. v. United States Dept. of Health & Human Servs.*, 663 F.Supp. 945, 950 (N.D.Ohio 1987), and *Patchogue Nursing Ctr. v. Bowen*, 797 F.2d 1137, 1144-45 (2d Cir.1986). This court subsequently relied on *Barry* in *Somani*, which involved a class action challenge to the manner in which inspections and surveys of skilled nursing facilities were conducted.

{¶ 32} Appellants argue the statement in *Barry* regarding a provider's property interest in continued participation in Medicaid was dictum and, therefore, not binding on this court. Appellants likewise argue *Somani* should not be considered binding because it simply relied on the dictum in *Barry*.

{¶ 33} Dictum is a statement in a court opinion that goes beyond the facts before the court. *Heisler v. Mallard Mechanical Co., LLC*, 10th Dist. No. 09AP-1143, 2010-Ohio-5549, ¶ 13. *See Black's Law Dictionary* 1240 (10th Ed.2014) (defining "obiter dictum" as "[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential"). Dictum includes statements made in a court opinion that are not necessary for the resolution of the issues before the court. *Heisler* at ¶ 13. Accordingly, dictum is not authoritative and is not considered part of the binding law of the case. *Id.*

{¶ 34} As explained above, *Barry* involved a challenge to the reimbursement rate paid to Medicaid providers. The case did not involve suspension or termination of a provider's participation in the Medicaid program. Thus, the narrow issue before the court in *Barry* was whether the providers had a protected property interest in the reimbursement

rate that could not be deprived without due process of law. Therefore, the court's statements regarding a provider's interest in continued participation in the program were not necessary to resolving the issue presented by the case. Thus, the statements were dicta and are not part of the binding law of the case. *See Nelnet, Inc. v. Rauch*, 10th Dist. No. 18AP-555, 2019-Ohio-561, ¶ 10 (finding statement not necessary to trial court's holding constituted dictum). Because *Somani* cited this dictum from *Barry* and did not engage in any independent analysis of a Medicaid provider's property interest in continued participation in the program, we likewise conclude that *Somani* is not binding on our decision in this appeal.

{¶ 35} Appellants argue that rather than *Barry* and *Somani*, we should look to recent federal court decisions concluding that Medicaid providers do not have a property interest in continued participation in the Medicaid program. Specifically, appellants cite the Sixth Circuit's decision in *Parrino v. Price*, 869 F.3d 392 (6th Cir.2017), and other federal appellate decisions cited in that case. The court in *Parrino* cited decisions from the First, Ninth, and Tenth Circuits reasoning that "health care providers are not the intended beneficiaries of the federal health care programs and they therefore do not have a property interest in continued participation or reimbursement." *Id.* at 398. As Portsmouth correctly observes, however, neither *Parrino* nor the other federal court decisions cited by it, analyzed whether *state* law afforded a provider a property interest in continued participation in Medicaid. *See Koerpel v. Heckler*, 797 F.2d 858, 865 (10th Cir.1986) ("If any state scheme exists which could be construed to create a continuing entitlement to Medicare reimbursements, Dr. Koerpel has not brought it to the court's attention."). Therefore, while we acknowledge the holding in *Parrino* and the cases relied upon by the Sixth Circuit in that decision, we do not find that holding to be applicable in this case, where Portsmouth asserts a protected property interest arising from state law.

**b. Creation of a constitutionally protected property interest**

{¶ 36} Portsmouth asserts that even if we find *Barry* and *Somani* not to be binding in this case, the Ohio statutes governing a nursing facility's participation in the Medicaid program create a constitutionally protected interest in continued participation in the Medicaid program. Therefore, we must consider how constitutionally protected property interests are created.

{¶ 37} The United States Supreme Court has held that "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). The Sixth Circuit has similarly held that "a party cannot possess a property interest in the receipt of a benefit when the state's decision to award or withhold the benefit is wholly discretionary." *Med Corp., Inc. v. Lima*, 296 F.3d 404, 409 (6th Cir.2002).

{¶ 38} In *Med Corp.*, the Sixth Circuit considered a due process challenge to a decision by the city of Lima, Ohio, to issue a one-week suspension of emergency dispatch calls to a private ambulance company. *Id.* at 407-08. The court held that to assert a property interest in receiving emergency dispatches from the city, the ambulance company was required to "point to some policy, law, or mutually explicit understanding that both confers the benefit and *limits the discretion* of the City to rescind the benefit." (Emphasis added.) *Id.* at 410. Where there was no written policy or legislative enactment establishing a procedure for maintaining the city's emergency dispatch list or limiting the discretion of city officials to remove ambulance companies from the dispatch list, the company could not demonstrate a constitutionally protected property interest in receiving emergency dispatch calls from the city. *Id.* at 410-11. By contrast, the court noted the ambulance company had a constitutionally protected property interest in its license to operate ambulances because the city's municipal code authorized suspension or revocation of a license as a penalty for failure to comply with the code, and the municipal code provided that revocation could only occur after a company was given a warning and reasonable time to comply. *Id.* at 411-12.

{¶ 39} Similarly, the Sixth Circuit found that an Ohio liquor license holder had a protected property interest in that license in part because the licensing statutes provided a right to a hearing before revocation of the license and a right to appeal an adverse determination. *Brookpark* at 715. The court concluded that "[w]hile the Ohio revocation provision does not state that a license can only be revoked for cause, the notice, hearing, and appeal provisions would be pointless unless the legislature intended there to be some reason for revocation." *Id.* Thus, the court found it relevant that the statutes limited the governing agency's discretion to revoke a liquor license. *See also Silver v. Franklin Township Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir.1992) ("To [establish a constitutionally protected property interest], Silver must prove that the Franklin Township

Board of Zoning Appeals did not have the discretion to deny Silver's use of the land as a condominium complex if he complied with certain minimum, mandatory requirements. If the Board had the discretion to deny Silver a conditional zoning certificate for a condominium complex even if he complied with certain minimum, mandatory requirements, then Silver would not have a 'legitimate claim of entitlement' or a 'justifiable expectation' in the approval of his plan. Silver, therefore, would have no property right. On the other hand, if state law circumscribed the discretion of the Board members to such an extent that approval of the particular use was mandatory once Silver met certain minimal requirements, then a property interest could exist."). (Internal citations omitted.)

{¶ 40} Courts have considered the scope of government discretion in assessing whether other states' laws create a protected property interest in continued participation in those states' Medicaid programs. The United States Court of Appeals for the Fourth Circuit concluded that North Carolina's Medicaid regulations created a property interest in continued participation in North Carolina's Medicaid program unless terminated for cause. *Bowens v. N. Carolina Dept. of Human Resources*, 710 F.2d 1015, 1018 (4th Cir.1983). Under the state's Medicaid regulations, medical peer review committees were used to review information gathered during investigations of potential overutilization or abuse of the Medicaid program. *Bowens* at 1016. A dentist whose participation in the Medicaid program had been suspended for three years following an investigation which alleged the regulations governing the peer review process created an expectation of continued participation in the program. *Id.* at 1017. The court noted the relevant regulations provided for notice and a full evidentiary hearing before the appropriate committee. The regulations required the committee to make findings of fact and conclusions of law, and reach a final decision about the appropriateness, necessity, and quality of the provider's care. *Id.* at 1017-18. The court noted that the North Carolina Department of Human Resources had authority to impose sanctions on providers, but the regulation included mandatory language requiring the agency to base its decision on the committee's findings, recommendations, and determination of cause. *Id.* at 1018. Because the regulations "contain[ed] procedural and substantive guarantees that expressly limit[ed] the reasons for and means by which a provider may be terminated," the court reasoned "[t]he only plausible inference that can be drawn from them is that a provider's participation is not

terminable at the will of the state." *Id.* Therefore, the court concluded, "the regulations create[d] a property interest in continued participation in the [Medicaid] program unless terminated for cause." *Id.*

{¶ 41} Similarly, the United States District Court for the Middle District of Tennessee concluded that Tennessee law governing Medicaid provider contracts created a constitutionally protected property interest in continuing participation in the Medicaid program. *Snodgrass-King Pediatric Dental Assocs., P.C. v. Dentaquest USA Ins. Co.*, 79 F.Supp.3d 753, 768-70 (M.D.Tenn.2015). The relevant statute provided that the commissioner of finance and administration had authority to enter into contracts for provision of services under Medicaid, and to terminate or suspend existing contracts, refuse to enter contracts, and recover incorrectly made payments. The law further provided that actions against a Medicaid provider were subject to the state's Administrative Procedure Act, affording the provider an opportunity to request a hearing. *Id.* at 768-69. Relying on *Brookpark*, the federal district court concluded the statutory language requiring notice and an opportunity to be heard prior to the loss of participation in Tennessee's Medicaid program limited the government's discretion to terminate participation in the program. Therefore, the court reasoned, the plaintiff established a constitutionally protected property interest. *Id.* at 770.

**c. Scope of appellants' discretion under Ohio law**

{¶ 42} To determine whether Ohio law creates a constitutionally protected property interest in continued participation in the Medicaid program, we must determine the extent of appellants' authority and discretion to enter into and to terminate Medicaid provider agreements with nursing facilities. A nursing facility operator is eligible to enter into a provider agreement where three conditions are met: (1) the facility is certified by ODH for participation in Medicaid, (2) the facility is licensed by ODH as a nursing home, and (3) the operator and the facility comply with all applicable state and federal laws. R.C. 5165.06. When those three conditions are met, ODM is required by law to enter into a Medicaid provider agreement with a nursing facility operator who applies for one. The statute does not grant ODM discretion with respect to entering a provider agreement with an operator of a nursing facility. R.C. 5165.07(A) ("[T]he department of medicaid *shall* enter into a provider agreement with a nursing facility operator who applies, and is eligible, for the

provider agreement."). (Emphasis added.) The only limited exception contained in the statute is that ODM is not permitted to revalidate a provider agreement if the provider fails to maintain its eligibility. R.C. 5165.072.

{¶ 43} With respect to termination of provider agreement, R.C. Chapter 5165 sets forth several grounds for termination. These can generally be grouped into two categories: (1) terminations related to deficiencies identified in surveys, and (2) other terminations.

{¶ 44} Four statutes provide for termination of a nursing facility's participation in the Medicaid program due to deficiency findings. When ODH cites a deficiency constituting a severity level four finding[2] that was not substantially corrected before a survey, ODM *may* terminate a facility's participation in the Medicaid program. R.C. 5165.72(A)(1)(a). When a notice of termination is issued due to a severity level four deficiency, the facility has an opportunity to allege the deficiency has been substantially corrected and have a follow-up survey conducted. R.C. 5165.72(B). Similarly, ODM *may* terminate a facility's participation in Medicaid if ODH finds a deficiency creating immediate jeopardy.[3] R.C. 5165.77(A)(1)(c). Prior to terminating a facility's participation on this basis, ODM is required to give notice to the facility of the nature of the emergency, the nature of the action ODM intends to take, and the rationale for taking that action. R.C. 5165.77(C)(1). When a notice of termination is issued due to a deficiency creating immediate jeopardy, the facility has an opportunity to allege that the condition of immediate jeopardy has been eliminated and have a follow-up survey conducted. R.C. 5165.77(D). For deficiencies that do not constitute severity level four findings or create immediate jeopardy, ODM *must* issue an order terminating a nursing facility's provider agreement if any one of the following conditions is not met: (1) the facility meets federal requirements for facilities that have a deficiency, (2) ODH has approved a plan of correction submitted by the facility, and (3) the provider agrees to repay the federal share of payments made to the facility if the deficiency is not corrected in accordance with the plan of correction. R.C. 5165.71(B). An order terminating a facility's participation on this basis is

---

[2] A "severity level four finding" is defined as "a finding of noncompliance by a nursing facility that has caused life-threatening harm to a facility resident or caused a resident's death." R.C. 5165.60(M)(4).

[3] "Immediate jeopardy" is defined as "one or more residents of a nursing facility are in imminent danger of serious physical or life-threatening harm." R.C. 5165.60(G).

subject to appeal under R.C. Chapter 119. R.C. 5165.71(B). Finally, if a nursing facility fails to substantially correct deficiencies within six months in accordance with a plan of correction, ODM *must* terminate the facility's participation in the Medicaid program. R.C. 5165.85(B). An order terminating a facility's participation for failure to correct deficiencies within six months is subject to appeal under R.C. Chapter 119. R.C. 5165.85(C). In addition to the provisions included in each statutory section, R.C. 5165.87(A)(1) expressly provides that an order terminating a facility's participation in the Medicaid program on these four deficiency-related grounds is subject to appeal under R.C. Chapter 119.

{¶ 45} Three statutes within R.C. Chapter 5165 provide additional, non-deficiency related grounds for termination. Under R.C. 5165.106, ODM *must* terminate a provider agreement when a facility that is statutorily required to file a cost report fails to file that report or files an incomplete or inadequate report. ODM is required to notify the facility 30 days prior to termination and the facility may submit a cost report during the 30-day period to avoid termination.[4] R.C. 5165.106. Under R.C. 5165.073, ODM *must* terminate the provider agreement of a facility that does not comply with state law regarding installation of fire extinguishing and fire alarm systems in residential care facilities.[5] Finally, under R.C. 5165.771, ODM *must* terminate a nursing facility's participation in the Medicaid program if it is placed in the SFF program and fails to be placed within Table C within 12 months or Table D within 24 months.

{¶ 46} Appellants argue Ohio law does not create a constitutionally protected property interest in continued participation in the Medicaid program because providers agree to comply with state and federal law as a condition of their participation. Appellants assert that because R.C. 5165.771 is one of the statutory provisions governing nursing facilities' participation in the Medicaid program, any property interest created under the statutory scheme is subject to the limitations contained in R.C. 5165.771. Thus, under

---

[4] The language in R.C. 5165.106 suggests ODM has the option of permitting an appeal from a notice of proposed termination for failure to file a cost report, stating that a provider shall continue to be paid "[d]uring the thirty-day termination period or *any additional time allowed for an appeal of* the proposed termination of a provider agreement." (Emphasis added.) However, the statute does not explicitly provide a right to appeal.

[5] A facility that violates the law requiring automatic fire extinguishing and alarm systems also may have its license revoked by ODH. *See* R.C. 3721.03(B)(1) (providing that the director of ODH may revoke a facility's license if a facility "[h]as violated any of the provisions of Chapter 3721. of the Revised Code or rules adopted by the director under it"). In the event of such a revocation by ODH, the facility has a right to appeal pursuant to R.C. Chapter 119.

appellants' circular reasoning, because a nursing facility agrees to comply with R.C. 5165.771 as a condition of participating in the Medicaid program, it cannot challenge the lack of due process afforded under that statute. However, we reject this "heads I win, tails you lose" approach to the analysis of property interests created under law.

{¶ 47} Reviewing the relevant statutes, it is apparent ODM has no discretion with respect to whether to enter a Medicaid provider agreement with a nursing facility and little discretion with respect to terminating a nursing facility's Medicaid provider agreement. The statute sets forth specific grounds for termination. In most instances, when the conditions set forth in the statute are met, ODM is not afforded any discretion and is required to terminate a facility's participation in Medicaid. Thus, similar to the laws analyzed in *Bowens*, participation in Ohio's Medicaid program is not terminable at the will of the state, but only where specified conditions are met. Unlike the regulatory scheme in *Med Corp.*, R.C. Chapter 5165 imposes strict limits on ODM's authority to rescind or terminate the benefits conferred on Medicaid providers. Given the strict limits on ODM's authority and discretion, we conclude that Ohio law creates a constitutionally protected property interest in continued participation in the Medicaid program.

**2. Does R.C. 5165.771 satisfy the requirements of due process?**

{¶ 48} Having found that termination of Portsmouth's Medicaid provider agreement, pursuant to R.C. 5165.771, would deprive it of a constitutionally protected property interest, we must consider whether the statute provides adequate procedural protections to satisfy the requirements of due process. "[S]ome form of hearing is required before an individual is finally deprived of a property interest." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews* quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

{¶ 49} On its face, R.C. 5165.771 expressly provides *no* procedural protections, stating that "[a]n order issued under this section is not subject to appeal under Chapter 119. of the Revised Code." R.C. 5165.771(C). Appellants argue, however, that nursing facilities receive "some form of hearing" sufficient for due process purposes because they can dispute deficiencies identified in surveys under the IDR process contained in 42 C.F.R. 488.331 and Ohio Adm.Code 3701-63-02. Appellants assert that because survey findings determine

whether a facility in the SFF program moves to Table C (indicating improvement) or Table D (indicating graduation from the program), the ability to challenge deficiency findings preventing a facility from moving to Table C or D satisfies the requirements of due process.

{¶ 50} ODM is not involved in the selection of nursing facilities for the SFF program or the submission of data that determines which SFF program table a facility is placed into. Selection of a facility for the SFF program begins with CMS providing a list of candidate facilities to ODH. ODH then recommends a facility from the candidate list, and CMS has final approval of ODH's recommendation. Jill Shonk, the assistant chief for the Bureau of Survey and Certification at ODH, testified that a nursing facility is not able to challenge ODH's recommendation that it be placed in the SFF program, and would not be aware of that recommendation until CMS placed the facility in the program. Whether a facility is deemed to have improved, and thus its placement within the SFF list tables, is based on results of surveys conducted by ODH. Although a facility may challenge the results of a survey through the IDR process, there is no process to challenge a facility's placement in the SFF program tables.

{¶ 51} With respect to the IDR process, Shonk testified the time required for each step of the process varied, but that each level of review could take 30 days or longer. Shonk testified she was not aware of CMS ever retroactively amending the SFF list due to the results of the IDR process. Dustin Ellinger, a health care compliance consultant who previously worked at ODH as bureau chief of long-term care quality, similarly testified he was not aware of CMS retroactively revising or amending the SFF list tables as a result of the IDR process. However, Ellinger testified that if a deficiency finding was removed as a result of the IDR process, it could result in a facility being considered to have improved in future iterations of the SFF list. CMS's public webpage regarding the SFF list indicates that while "[e]very attempt is made to assure the accuracy and timeliness of the information on the [SFF] list * * * data lags of up to several months can occur between completion of a survey and posting of data on this list." (Joint Ex. 16.) In this case, a letter issued by ODH to Portsmouth on March 6, 2019 indicated the results of Portsmouth's IDR request related to the January 2019 standard survey were still pending as of that date. Thus, only three days before appellants intended to terminate Portsmouth's participation in Medicaid, review of Portsmouth's challenge to the second survey performed while Portsmouth was in

the SFF program was not complete. Although Portsmouth was able to challenge the results of that survey through the IDR process, there was no mechanism for Portsmouth to directly challenge the determination of whether it would be deemed to have improved for purposes of the SFF program tables.

{¶ 52} Given the severity of the remedy imposed on a nursing facility under R.C. 5165.771 for failure to be deemed to have shown improvement within 12 months, the inherent delays involved in the IDR process, and CMS's admission that the SFF program tables may not be based on the latest data, we cannot find that the ability to challenge survey results, pursuant to 42 C.F.R. 488.331 and Ohio Adm.Code 3701-63-02, constitutes an opportunity to be heard at a meaningful time and in a meaningful manner with respect to termination of a provider agreement under R.C. 5165.771.

{¶ 53} Appellants further argue the common pleas court erred by failing to consider the three factors set forth in *Mathews* in determining whether due process had been satisfied. In *Mathews*, the United States Supreme Court concluded its decisions indicated that three factors were to be considered in determining the requirements of due process: (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and (3) the government's interest, including the function involved and the fiscal and administrative burdens that additional procedural requirements would entail. *Id.* at 335. The United States Supreme Court and the Supreme Court have applied the *Mathews* factors in the context of administrative hearings. *LTV Steel Co. v. Indus. Comm.*, 140 Ohio App.3d 680, 689 (10th Dist.2000). Portsmouth argues the *Mathews* factors apply when determining whether a pre-termination hearing is required, and that this case is broader because R.C. 5165.771 does not provide for either a pre- or post-termination hearing.

{¶ 54} Assuming for purposes of analysis that the *Mathews* factors apply here, we find the factors favor additional procedural safeguards. As explained above, we conclude Ohio law creates a constitutionally protected property interest in continued participation in the Medicaid program for a nursing facility; therefore, a substantial private interest is involved. With respect to the second factor, because of the inherent delays in challenging individual survey results and CMS's admission that the SFF list tables may not be based on

the most recent survey data, we find there is a risk of erroneous deprivation due to the 12-month time limit contained in R.C. 5165.771. Finally, with respect to the government's interest, as discussed above, there are other provisions under R.C. Chapter 5165 that allow termination of a nursing facility's Medicaid provider agreement due to survey related deficiency findings.

**3. Conclusion as to Portsmouth's due process claims**

{¶ 55} Because we conclude Ohio law creates a constitutionally protected property interest in continued participation in the Medicaid program for nursing facilities and R.C. 5165.771 does not contain adequate procedural protections to prevent the deprivation of that interest without due process of law, we hold the common pleas court did not err by finding R.C. 5165.771 to be facially unconstitutional in violation of the Due Process Clause of the United States Constitution and the Due Course Clause of the Ohio Constitution.

{¶ 56} Portsmouth's claim alleging violations of the United States Constitution was filed under Title 42, Section 1983, of the United States Code, which provides a remedy against a person acting under color of law who causes the deprivation of any rights, privileges, or immunities secured by the Constitution and laws. ODM, as a state agency, is not a "person" subject to suit under Section 1983. *See Morning View Care Ctr.-Fulton v. Ohio Dept. of Human Servs.*, 148 Ohio App.3d 518, 2002-Ohio-2878, ¶ 26 (10th Dist.). Accordingly, the common pleas court erred as a matter of law by granting judgment against ODM on Portsmouth's claim under Section 1983 for violations of the United States Constitution. Therefore, notwithstanding our conclusion that the trial court did not err by finding R.C. 5165.771 to be facially unconstitutional, we reverse the common pleas court's judgment to the extent it granted judgment against ODM on Portsmouth's federal constitutional claim pursuant to Section 1983. On remand, the common pleas court shall enter judgment as a matter of law in favor of ODM on appellants' claim under Section 1983.

{¶ 57} Accordingly, we overrule in part and sustain in part appellants' first assignment of error.

**E. Permanently Enjoining Enforcement of R.C. 5165.771**

{¶ 58} Next, we turn to appellants' third assignment of error, in which they argue the common pleas court erred by granting a permanent injunction because Portsmouth should not have prevailed on the merits of its due process claims. For the reasons set forth

in our analysis of appellants' first assignment of error, we conclude R.C. 5165.771 violates the Due Process Clause of the United States Constitution and the Due Course Clause of the Ohio Constitution. Therefore, the common pleas court did not err by granting a permanent injunction prohibiting enforcement of R.C. 5165.771.

{¶ 59} Accordingly, we overrule appellants' third assignment of error

**F. Timing of Termination Under R.C. 5165.771**

{¶ 60} Finally, appellants assert in their second assignment of error the common pleas court erred by holding that R.C. 5165.771(B)(3) did not authorize ODM to terminate Portsmouth's Medicaid provider agreement until April 19, 2019. As explained above, we conclude the common pleas court did not err by finding R.C. 5165.771 to be facially unconstitutional. Because the statute is unconstitutional, ODM could not terminate Portsmouth's Medicaid provider agreement pursuant to the statute. Therefore, any question regarding the timing of a termination under R.C. 5165.771 is rendered moot.

{¶ 61} Accordingly, we dismiss as moot appellants' second assignment of error.

**G. Consideration of Whether R.C. 5165.771 Violates the Non-delegation Doctrine**

{¶ 62} In its cross-appeal, Portsmouth set forth a single assignment of error arguing the common pleas court erred by finding that R.C. 5615.771 did not violate the constitutional non-delegation doctrine. Having concluded the common pleas court did not err by finding R.C. 5165.771 to be facially unconstitutional in violation of the Due Process Clause of the United States Constitution and the Due Course Clause of the Ohio Constitution, we need not reach the question of whether the statute is also unconstitutional in violation of the non-delegation doctrine. *See, e.g., Riverside v. State*, 190 Ohio App.3d 765, 2010-Ohio-5868, ¶ 15 (10th Dist.) ("Whether R.C. 718.01(H)(11) is unconstitutional for one reason or for three reasons, the result is the same. Thus, the question of whether R.C. 718.01(H)(11) violated the state and/or federal equal protection clauses was rendered moot by the trial court's conclusion that the statute was unconstitutional on other grounds."). The sole assignment of error asserted in Portsmouth's cross-appeal is rendered moot by our ruling on appellants' first assignment of error.

{¶ 63} Accordingly, we dismiss as moot the sole assignment of error asserted in Portsmouth's cross-appeal.

**IV. Conclusion**

{¶ 64} For the foregoing reasons, we deny Portsmouth's motion to dismiss this appeal. We sustain in part and overrule in part appellants' first assignment of error, sustain appellants' second assignment of error, and dismiss as moot appellants' third assignment of error. We further dismiss as moot the sole assignment of error raised in Portsmouth's cross-appeal. We reverse the judgment of the Franklin County Court of Common Pleas to the extent it granted judgment against ODM on Portsmouth's claim under Section 1983 and to the extent it ruled on Portsmouth's claim that appellants violated R.C. 5165.771(B)(3) by seeking to terminate Portsmouth's Medicaid provider agreement prior to April 19, 2019; we affirm the judgment in all other respects. We remand this matter to the trial court for further proceedings consistent with law and this decision.

*Motion to dismiss denied;*
*judgment affirmed in part, reversed in part,*
*and cause remanded.*

SADLER, P.J., concurs.
LUPER SCHUSTER, J., concurs.

LUPER SCHUSTER, J., concurring.

{¶ 65} I agree with the majority's decision to deny Portsmouth's motion to dismiss the appeal, and I further agree with the majority's determination that R.C. 5165.771 is facially unconstitutional. However, because I would apply a more limited analysis to Portsmouth's motion to dismiss, I write separately.

{¶ 66} In its motion to dismiss, Portsmouth asserts that any ruling of this court, whether we were to affirm or reverse the trial court's decision, would have no practical effect on Portsmouth's ability to participate in the Ohio Medicaid program. Though Portsmouth states its reinstatement is a foregone conclusion, the status of Portsmouth's reinstatement to the Ohio Medicaid program is not at issue before the court. Rather, the issue before the trial court, and now before this court, is whether ODM's termination of Portsmouth was unlawful. I would find that question is not moot and, therefore, would not explore the exceptions to the mootness doctrine.