[Cite as *In re N.L.*, 2025-Ohio-2625.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| N.L., et al. | : | CASE NO. CA2025-03-023 |
| | : | OPINION AND<br>JUDGMENT ENTRY |
| | : | 7/28/2025 |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. JN2022-0279; JN2022-0280

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Traci M. Carr, for mother.

**O P I N I O N**

**BYRNE, J.**

{¶ 1} Appellant ("Mother"), the biological mother of minor children N.L. ("Nolan") and K.L. ("Kevin"), appeals the decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of the children to the Butler County

Department of Jobs and Family Services ("the Agency").[1] For the reasons outlined below, we affirm the juvenile court's decision.

## I. Factual and Procedural Background

{¶ 2} Nolan and Kevin were born in December 2014 and September 2016, respectively. Until their removal, the children resided with Mother and her live-in boyfriend ("Boyfriend"). The family had prior involvement with the Hamilton County children's services agency due to concerns about domestic violence and inadequate housing conditions.

{¶ 3} On August 27, 2022, the children were removed from Mother's home following what the Agency's complaint described as "allegations of child trafficking." According to the complaint, Mother and Boyfriend admitted to police that they had attempted to "sell" the children and had been using methamphetamine. The juvenile court issued an emergency ex parte order placing the children in the Agency's temporary custody and imposed a no-contact order.

{¶ 4} On November 4, 2022, the juvenile court adjudicated the children dependent and later issued a dispositional order awarding temporary custody of the children to the Agency.

{¶ 5} The Agency developed a reunification case plan for Mother. The case plan required Mother to refrain from illegal drug use, complete a mental health assessment, and provide a safe and stable environment for the children. Boyfriend was initially included in the case plan, but he refused to participate and was thereafter removed.

---

1. "Nolan" and "Kevin" are pseudonyms adopted for this opinion for the purposes of privacy and readability. *In re D.P.* 2022-Ohio-4553, ¶ 1, fn. 1 (12th Dist.); *The Supreme Court of Ohio Writing Manual*, § 16, at 115 (3d Ed. 2024).

{¶ 6} The record shows that Mother was repeatedly warned that her continued relationship with Boyfriend would jeopardize reunification. When asked about her relationship with Boyfriend, Mother specifically informed the Agency—on more than one occasion—that she was no longer in a relationship with him and that he was "not in the picture at all."

{¶ 7} Mother made some progress on her case plan. She obtained drug and mental health treatment, and maintained housing. As a result, Mother's no-contact order was eventually modified to permit supervised contact with Nolan and Kevin upon approval of the children's therapist. However, it was not until July 2023—nearly a year after the children's removal—that the children's trauma was sufficiently addressed to allow Mother visitation.

{¶ 8} On August 7, 2023, Mother began supervised visitation. Mother's visitation was later expanded to allow for unsupervised visits. On April 13, 2024, the children had their first unsupervised six-hour visit at Mother's home. Two weeks later, they stayed overnight for the first time.

{¶ 9} However, on May 15, 2024, the Agency filed an emergency motion to suspend visitation. A supporting affidavit from the caseworker alleged that Boyfriend had been secretly residing in Mother's home and was present during the children's unsupervised visits. The caseworker also reported that Mother had instructed the children to lie about Boyfriend's presence. Furthermore, the Agency reported that Boyfriend had sexually abused Kevin during one of the unsupervised visits. Thereafter, the juvenile court issued an ex parte order suspending visitation and again imposed a no-contact order.

{¶ 10} On June 26, 2024, the Agency filed a motion for permanent custody. In November 2024, the court held the permanent custody hearing. Both Mother and the caseworker testified.

{¶ 11} Mother testified about the initial report of human trafficking, which she said was made by Boyfriend. She admitted to telling Boyfriend that she planned to sell the children, though she later clarified that she only mentioned selling Nolan. She further claimed that she had been lying to Boyfriend about her intentions and never actually meant to sell Nolan. She attributed these statements to her methamphetamine use. According to Mother, "[i]t wasn't specific sex trafficking. It was simply human trafficking. So a trade in exchange for a large sum of money."

{¶ 12} Additionally, Mother acknowledged that she had repeatedly lied to the Agency about her ongoing relationship with Boyfriend. She justified this deception by explaining that Boyfriend was her only source of support and suggested that the Agency held a "predisposition" against him. She expressed frustration at being forced to choose between her relationship with Boyfriend and her relationship with her children, stating, "I believe I should have the choice to be with whoever I want to be with sexually and it shouldn't affect whether I have custody of my children or not."

{¶ 13} Agency caseworker Heather Bauman testified that while Mother had completed several components of her case plan, she had not completed the Family Preservation Program meant to help the reunification process or Developmental Living Skills, a parenting service offered by the Agency. Bauman also noted the Agency declined to offer Mother further services once it became clear she remained committed to Boyfriend.

{¶ 14} Bauman recounted multiple conversations with Mother in which Bauman explained that maintaining a relationship with Boyfriend was incompatible with reunification. Mother insisted that the relationship had ended until the truth was later revealed. Bauman testified that Mother's home remained unsafe for the children and that they were "petrified of [Boyfriend]." She concluded that the issues which initially led to the

children's removal had not been resolved and recommended that permanent custody be awarded to the Agency.

{¶ 15} On November 18, 2024, the magistrate issued a decision granting permanent custody to the Agency. Mother filed objections. Among those objections, Mother argued that the trial court erred by denying her motion to strike reports filed by the Court Appointed Special Advocate ("CASA") and the Guardian ad Litem ("GAL"). At the hearing on objections, the juvenile court announced it had chosen not to read either the CASA reports or the GAL reports in reviewing the matter, specifically because the court wanted to hear argument on whether the reports were admissible and "didn't want to taint my ruling either way." The court then heard arguments on the admissibility of these reports. Afterwards, the court announced that it would not strike the reports, but that without a specific hearsay exception being applicable, it would not consider those reports as evidence and would also not consider any statements of the children contained in the reports. Ultimately, the juvenile court overruled Mother's objections and adopted the magistrate's findings. Mother filed a timely appeal.[2]

## II. Legal Analysis

{¶ 16} Because Mother's assignments of error are interrelated we will address them together.

{¶ 17} Mother's Assignment of Error No. 1 states:

> THE TRIAL COURT'S DECISION TO GRANT PERMANENT CUSTODY OF THE CHILDREN IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

---

2. The children's biological father did not appeal the juvenile court's decision and is not a party to this appeal. We therefore do not analyze the juvenile court's decision with respect to his loss of custody.

{¶ 18} Mother's Assignment of Error No. 2 states:

THE TRIAL COURT ERRED WHEN IT AWARDED PERMANENT CUSTODY TO [the Agency], IN THAT THE REQUIREMENTS OF THE TWO-PRONG TEST WERE NOT MET.

{¶ 19} On appeal, Mother argues that the juvenile court's decision granting permanent custody of the children to the Agency was against the manifest weight of the evidence and was not supported by sufficient evidence. Mother's arguments are general in nature, but she specifically mentions there was inadequate evidence to show that she did not complete her case plan services. She further suggests that the court relied heavily on information contained in the social summaries, GAL reports, and CASA reports, which she argues included inadmissible hearsay and should not have been considered.

## A. Applicable Law and Standards of Review

{¶ 20} "Before a natural parent's constitutionally protected liberty interest in the care and custody of [their] child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met." *In re M.G.*, 2023-Ohio-1316, ¶ 44 (12th Dist.); R.C. 2151.414(E). Under R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re K.P.*, 2022-Ohio-1347, ¶ 17 (12th Dist.). First, R.C. 2151.414(B)(1) provides that the juvenile court must find that the grant of permanent custody to the agency is in the "best interest" of the child. *In re M.H.*, 2022-Ohio-48, ¶ 35 (12th Dist.). Second, the juvenile court must find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) apply. *In re R.B.*, 2022-Ohio-1705, ¶ 31 (12th Dist.). Those circumstances include, but are not limited to: (1) the child is abandoned, R.C. 2151.414(B)(1)(b); (2) the child is orphaned, R.C. 2151.414(B)(1)(c); (3) the child has

- 6 -

been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period, R.C. 2151.414(B)(1)(d); (4) the child has been removed from the parents' custody or been adjudicated as abused, neglected, or dependent on three separate occasions, R.C. 2151.414(B)(1)(e); and (5) the circumstances described in R.C. 2151.414(B)(1)(b), (c), (d), and (e) do not apply and the child cannot be placed with either the child's parents within a reasonable time or should not be placed with the parents, R.C. 2151.414(B)(1)(a). *In re J.B.*, 2023-Ohio-2454, ¶ 13 (12th Dist.). Only one of these circumstances need apply to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 2020-Ohio-4414, ¶ 16 (12th Dist.).

{¶ 21} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re A.S.*, 2019-Ohio-4127, ¶ 19 (12th Dist.). However, "[e]ven if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence." *In re G.A.*, 2023-Ohio-643, ¶ 18 (12th Dist.), citing *In re F.S.*, 2021-Ohio-345, ¶ 61 (12th Dist.). In determining whether a juvenile court's judgment is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence favors the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 2021-Ohio-3074, ¶ 15 (12th Dist.). Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound

to give it the interpretation that is consistent with the verdict and judgment. *In re D.S.*, 2022-Ohio-998, ¶ 63 (12th Dist.).

### B. First Part of the Permanent Custody Test: Best Interest Analysis

{¶ 22} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, a juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . .;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

A juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re A.J.*, 2019-Ohio-593, ¶ 24 (12th Dist.).

{¶ 23} In this case, the magistrate thoroughly evaluated each of the best interest factors outlined in R.C. 2151.414(D) and concluded that granting permanent custody of Nolan and Kevin to the Agency was in their best interest. The juvenile court overruled Mother's objections and adopted the magistrate's findings and judgment. Upon review, we find no error in the magistrate's analysis and agree with the juvenile court's decision.

{¶ 24} As to the first best interest factor—that is, the interaction and interrelationship of the children with their parents, foster caregivers, and others, R.C. 2151.414(D)(1)(a)—the evidence demonstrates that Mother placed her personal interests above the well-being of her children.

{¶ 25} At the outset of the case, after the children were removed because of the report of possible human trafficking, both Mother and Boyfriend were subject to a no-contact order prohibiting any interaction with the children. Although Mother complied with portions of her case plan, Boyfriend refused to participate in drug screening or engage in any of the required services. The Agency advised Mother that her continued relationship with Boyfriend was a significant obstacle to reunification. In response, Mother repeatedly lied to the Agency, claiming to have ended the relationship.

{¶ 26} As the case progressed, the no-contact order was modified to allow supervised visitation, contingent upon approval from the children's therapist. Due to lingering trauma, the children continued to express fear and anxiety related to their past experiences. It was not until July 2023—nearly a year into the case—that the children's emotional state had improved enough to permit supervised visits with Mother. These visits were gradually expanded, eventually including an unsupervised visit to Mother's home on April 13, 2024, and an unsupervised overnight visit on April 27, 2024.

{¶ 27} However, the Agency then discovered that Mother had lied about her relationship with Boyfriend. Contrary to her claims, Boyfriend was residing in the home during the children's unsupervised visits, in direct violation of the no-contact order. The caseworker further testified that both children remain deeply traumatized by their prior experiences with Boyfriend, continue to require mental health services and intervention at school, and continue to suffer emotional distress related to their time in Mother's care.

Moreover, the caseworker testified that the Agency had determined the allegations of sexual abuse by Boyfriend were "substantiated."[3]

{¶ 28} Despite the severity of these allegations, Mother was dismissive and denied that Boyfriend sexually abused Kevin. She instead asserted that Boyfriend merely tickled Kevin, and explained that she saw no reason to intervene (despite Kevin's request for her to intervene) because "[e]verybody is uncomfortable being tickled," because there was no law against tickling, and because "[t]here was nothing to protect him against." She also asserted that she believed the no-contact order no longer applied to Boyfriend after he was removed from the case plan. But Mother's testimony on these points (as well as others) was certainly not credible given the number of times she admitted lying or encouraging others to lie.

{¶ 29} Moreover, during the permanent custody hearing, Mother testified "I believe I should have the choice to be with whoever I want to be with sexually and it shouldn't affect whether I have custody of my children or not." This comment reveals a shocking disregard for the best interest of the children. Even if Mother is correct that Boyfriend did not sexually abuse Kevin, Boyfriend still admitted to engaging in a conversation about selling one or more of the children to human traffickers and admitted using methamphetamine. Whatever Boyfriend's specific behavior was, the children were deeply traumatized by their experiences with Boyfriend, and yet Mother refused to keep the children from Boyfriend, exposed them to him despite a no-contact order, and even encouraged the children to lie in order to prevent the Agency from learning that Boyfriend was still in her life and home. Mother chose her sexual relationship with Boyfriend over

---

3. This was a reference to testimony at the earlier shelter care hearing that Kevin had stated that Boyfriend had moved Kevin's underwear aside, touched and kissed Kevin in his groin area near his penis, and made sucking sounds during this activity, which he described as "baby bites."

her children's safety and best interests, but her choice did not alleviate the juvenile court's obligation to make a decision in the children's best interest.

{¶ 30} In contrast, the children's foster family has provided a safe, stable, and nurturing environment. The foster parents have consistently met the children's emotional and mental health needs, and the children have made observable progress in their recovery.

{¶ 31} For these reasons, the first best interest factor weighs heavily in favor of awarding permanent custody to the Agency.

{¶ 32} Regarding the second best interest factor—the wishes of the children, R.C. 2151.414(D)(1)(b)—the juvenile court noted that no request had been made for an in camera interview. Nevertheless, the court considered the recommendations of the GAL and CASA. Both the GAL and CASA supported granting permanent custody to the Agency.

{¶ 33} Regarding the third best interest factor—the custodial history of the children, R.C. 2151.414(D)(1)(c)—the record establishes that, at the time the Agency filed its motion for permanent custody, the children had been in the Agency's care for more than 12 of the previous 22 consecutive months. This factor supports the conclusion that granting permanent custody to the Agency was appropriate and in the children's best interest.

{¶ 34} As to the fourth best interest factor—the children's need for a legally secure permanent placement, R.C. 2151.414(D)(1)(d)—the juvenile court noted that Mother has a history of mental health and substance abuse issues. The children were initially removed from her care due to concerns related to drug use and a disturbing report that she intended to sell the children to human traffickers. Although Mother completed portions of her case plan, she actively deceived the Agency about her ongoing relationship with

Boyfriend and violated the court's no-contact order by allowing him access to the children. Mother's testimony that she believed Boyfriend was permitted to have contact with the children because he was removed from the case plan was not credible.

{¶ 35} Following serious allegations that Boyfriend had sexually abused Kevin, Mother's visitation rights were again suspended. Despite the severity of the allegations and the trauma experiences by the children, Mother failed to recognize the safety risks posed by Boyfriend and continued to minimize the situation. Her disregard for court orders and inability to prioritize the children's safety demonstrate that she is unable to provide a legally secure and safe placement. Accordingly, this factor weighs in favor of granting permanent custody to the Agency.

{¶ 36} In light of the foregoing, we conclude that the juvenile court did not err in finding the best interest factors weighed in favor of awarding permanent custody to the Agency. There was sufficient credible evidence to support the juvenile court's determination that awarding permanent custody of the Agency was in the children's best interest, and the juvenile court's determination was not against the manifest weight of the evidence.

### C. Second Part of the Permanent Custody Test

{¶ 37} On appeal, Mother does not challenge the juvenile court's finding under R.C. 2151.414(B)(1)(d) that Nolan and Kevin had been in the temporary custody of the Agency for at least 12 months of a consecutive 22-month period. Because this "12 of 22" finding is unchallenged, we need not address it further. *In re J.N.L.H.*, 2022-Ohio-3865, ¶ 26 (12th Dist.). Nevertheless, the record clearly supports the juvenile court's determination, as Nolan and Kevin were adjudicated dependent in November 2022 and remained in the Agency's custody through the filing of the permanent custody motion in June 2024.

**D. Mother's Remaining Arguments**

**{¶ 38}** Although Mother's arguments are mostly general in nature, she also specifically argues that the juvenile court's decision relied heavily on hearsay evidence contained in the social summaries, as well as the reports submitted by the GAL and the CASA. However, she fails to identify any portion of the record to substantiate this argument. Furthermore, the juvenile court explicitly stated that it did not consider any hearsay evidence contained in the reports. As the trier of fact, the juvenile court is presumed to have properly disregarded any inadmissible hearsay. *In re Sherman*, 2005-Ohio-5888, ¶ 31 (3d Dist.). And even if the juvenile court did rely in part on inadmissible hearsay, such reliance would have been harmless error because the record contains substantial admissible evidence from both the caseworker and Mother herself that supports the juvenile court's decision. *See In re A.S.*, 2009-Ohio-3932, ¶ 57 (12th Dist.).

**{¶ 39}** We further note that even though Mother completed portions of her case plan, a case plan is simply a means to a goal and is not the goal itself. *In re F.S.*, 2021-Ohio-345, ¶ 68 (12th Dist.).

**III. Conclusion**

**{¶ 40}** In light of the foregoing, we conclude the juvenile court did not err by determining that it was in Nolan's and Kevin's best interest to grant permanent custody to the Agency. The juvenile court's decision to grant permanent custody of Nolan and Kevin to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. We overrule Mother's two assignments of error.

**{¶ 41}** Judgment affirmed.

HENDRICKSON, P.J., and SIEBERT, J., concur.

## **J U D G M E N T   E N T R Y**

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Butler County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/ Robert A. Hendrickson, Presiding Judge

/s/ Matthew R. Byrne, Judge

/s/ Melena S. Siebert, Judge