[Cite as *In re E.D.L.*, 2026-Ohio-28.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| IN RE: | : | |
| | | CASE NOS. CA2025-07-055 |
| E.D.L. | : | CA2025-07-056 |
| | : | |
| | : | OPINION AND |
| | | JUDGMENT ENTRY |
| | : | 1/7/2026 |
| | : | |
| | : | |


APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 23-D000106


KL Hurd Law, LLC, and Kenyatta Hurd, for appellant, father.

Kathleen Mezher & Associates, and Alexander Misali, for appellant, mother. (mother not seeking custody and not filing brief)

Law Office of Arica L. Underwood, and Arica L. Underwood, for appellant, grandmother

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Robyn T. Revelson, guardian ad litem

## O P I N I O N

**BYRNE, J.**

{¶ 1}   Appellants, the biological father ("Father") and the paternal grandmother ("Grandmother") of the minor child, "Ethan," separately appeal the decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of Ethan to Warren County Children Services (the "Agency").[1] For the reasons outlined below, we affirm the juvenile court's decision.

### I. Overview

### A. Physical Abuse and Father's Conviction

{¶ 2}   Ethan was born in December, 2022. Father and Ethan's biological mother ("Mother") were never married but lived together for a time while dating, including after Ethan's birth.

{¶ 3}   In May of 2023, the Agency received a referral for physical abuse when four-month-old Ethan showed up to a hospital with five rib fractures, a broken femur, and a bruised temple. Father was the alleged perpetrator. Mother was at work when Ethan was injured.[2] When Mother recognized his injuries, she took Ethan to the hospital. Ethan was briefly placed with his maternal grandparents, but in July 2023 he was returned to Mother's custody, and the case was closed, after the Agency found that Mother was protective of Ethan.

---

1. All children's names used in this opinion are pseudonyms adopted for the purpose of privacy and readability. *In re D.P.*, 2022-Ohio-4553, ¶ 1, fn. 1 (12th Dist.); *The Supreme Court of Ohio Writing Manual*, § 16, at 115 (3d Ed. 2024).

2. Mother has another child, "Michael." Custody of Michael, who has a different father than Ethan, is not at issue in this case.

{¶ 4} On November 21, 2023, Father was convicted of Felonious Assault in violation of R.C. 2903.11(A)(1) and Child Endangerment in violation of R.C. 2919.22(B)(1)—both second degree felonies—for his physical abuse of Ethan. Father was sentenced to prison for 8-to-12 years and his release date from prison is 2031. Mother also obtained a civil protection order against Father on Ethan's behalf. That protection order expires in 2028.

### B. Agency's Reopening of Case

{¶ 5} In November 2023, Mother called the Agency and stated that she was having thoughts of harming Ethan because he reminded her of Father. She told the Agency that every time she saw Ethan, she saw Father and this "scare[d] her." Mother told the Agency that she loved Ethan but for various reasons, she thought the best option for him was to go into foster care. Specifically, Mother indicated to the Agency that foster care was the best option for Ethan because she struggled with depression and no longer attended therapy. She also never wanted two children, and she had an "odd feeling" that "[Father] [would] come looking for her." Mother expressed to the Agency that she did not trust anyone from Father's family to keep Ethan away from Father when he was released from prison.

{¶ 6} Following her call with the Agency, Mother was sent for a psychiatric evaluation. While Mother was being evaluated, the Agency implemented a voluntary three-day safety plan in which Mother agreed to place Ethan with his maternal grandparents. Shortly after Ethan was placed with his maternal grandparents, they indicated that they could not care for Ethan long term because of their own physical health concerns. Upon Mother's release from her psychiatric evaluation, she reiterated that it was in Ethan's best interests to be in foster care.

- 3 -

**C. Agency's Temporary Custody and Mother's Case Plan**

{¶ 7} On November 9, 2023, the Agency filed a complaint with the Warren County Common Pleas Court, Juvenile Division, alleging that Ethan was abused and dependent. On the same day, the Agency filed a motion for temporary custody of Ethan. The juvenile court conducted an emergency shelter care hearing and then granted the Agency's motion for temporary custody. The Agency then placed Ethan in foster care.

{¶ 8} On December 14, 2023, the juvenile court approved the Agency's case plan for Mother. The case plan's goal was the reunification of Mother with Ethan. The case plan required Mother to complete mental health and substance use assessments and to follow through with all resulting recommendations. The case plan also required Mother to comply with random drug screens and to complete a psychiatric assessment. The Agency permitted Mother to visit Ethan once a week for two hours at the Agency's visitation center.

{¶ 9} After placing Ethan with a foster family, the Agency searched for a temporary kinship placement. The Agency initially looked at both the maternal and paternal sides of Ethan's family. The Agency seriously looked at Grandmother as a potential placement for Ethan and decided to conduct a home study with her.

**D. Grandmother's Housing, Living, and Family Situation**

{¶ 10} Grandmother testified that she lives in a ranch-style home with three bedrooms. She stated that her sister, Keisha, lives with her along with her six-year-old grandson, Zeke, of whom she has legal custody. Grandmother indicated that if she obtained legal custody of Ethan then he would share a room with Zeke. She further testified that she has two adult nieces who visit with their children regularly.

{¶ 11} Grandmother has three children of her own—two of whom are in prison.

She testified that she did not raise Father, but that his aunt raised him. Grandmother further stated that Father's father was in prison for seven years while Father grew up.

{¶ 12} Grandmother further testified that she is employed as an office manager, has health insurance, and would be able to add Ethan to her health insurance if she obtained legal custody of him.

### E. Grandmother's First Home Study

{¶ 13} In early December of 2023, the Agency conducted a home study of Grandmother's home. The Agency supervisor, Brittany Smith, testified that while the Agency wanted Grandmother's home to work as a placement for Ethan, the Agency denied Grandmother's first home study for various reasons. First, Grandmother's sister, Keisha, who lived with her, did not complete a BCI background check as requested, even after Agency reminders. Second, the Agency was concerned about comments Grandmother made which the Agency viewed as minimizing Father's physical abuse of Ethan.

{¶ 14} Contrary to Smith's testimony, Grandmother testified that she "never got an answer" from the Agency regarding her first home study.

### F. Guardian Ad Litem's Initial Report

{¶ 15} The appointed guardian ad litem ("GAL") submitted an initial report to the juvenile court on January 5, 2024. The report described the GAL's conversations with Mother and other individuals with relevant knowledge. The GAL explained that Mother's mental state had improved since her November 2023 call to the Agency. Specifically, the GAL indicated that Mother had moved out of the apartment that she shared with Father, and that she lived in her new boyfriend's home. Mother told the GAL that moving away from her old apartment where Father abused Ethan "helped heal her" and that "it lifted a

dark cloud" around her. Mother believed that she needed to continue with therapy before being reunified with Ethan but looked forward to seeing Ethan at visitation and wanted to eventually increase the amount of visitation time with him.

{¶ 16} The GAL recommended that Ethan should remain in the temporary custody of the Agency while Mother worked through some parenting classes and therapy. The GAL looked forward to the reunification of Mother and Ethan.

### G. Adjudication, Disposition, and the Agency's Custody Motion

{¶ 17} On January 9, 2024, a magistrate conducted an adjudication hearing. The next day, January 10, 2024, the magistrate adjudicated Ethan dependent and abused, and continued all orders in effect. The juvenile judge affirmed the magistrate's adjudication decision.

{¶ 18} On February 7, 2024, after a dispositional hearing, the magistrate ordered Ethan to remain in the temporary custody of the Agency, and the juvenile judge affirmed the magistrate's disposition. This was consistent with the Agency's recommendation that Ethan remain in its temporary custody while Mother worked toward reunification.

{¶ 19} On March 28, 2024, after observing Mother make "great progress" on her mental health and other progress on her case plan, the Agency filed a motion asking the court to grant legal custody of Ethan to Mother and to close the case.

### H. Grandmother's Motion to Intervene and Motion for Legal Custody

{¶ 20} On May 14, 2024, Grandmother filed a motion to intervene and a motion for custody of Ethan. Though Grandmother's motion for custody referred to "temporary" custody, the magistrate and juvenile court judge apparently interpreted the motion as seeking "legal" custody. The parties consistently referred to it as a motion for legal custody. We will do the same. Regardless, the juvenile court did not immediately address

that motion, which we will discuss further below.

### I. Mother's First and Second Home Trials

{¶ 21} Because of Mother's positive progress, in May 2024, the Agency attempted to conduct a home trial with Mother. But Mother told the Agency that she wanted to hold off before participating in a home trial with Ethan because she wanted to start cognitive therapy.

{¶ 22} On July 11, 2024, the Agency attempted a second home trial with Ethan staying with Mother. This time, Mother engaged in the home trial. However, she ended the home trial on July 31, 2024. On that day, Mother informed the Agency that she no longer wanted to work towards reunification with Ethan because she did not bond well with him and because she was unable to care for him.

{¶ 23} The Agency then removed Ethan from Mother's care and placed him back with his foster care family. A week later, on August 7, 2024, at the 180-day review hearing, Mother reiterated her position that she did not want to reunify with Ethan. The Agency then withdrew its motion for Mother to be awarded legal custody of Ethan.

### J. Extension of Temporary Custody and Grandmother's Visitation with Ethan

{¶ 24} The Agency again looked at kinship placements. On October 3, 2024, the Agency filed a motion for a six-month extension of temporary custody of Ethan so the Agency could conduct a second home study with respect to Grandmother. The juvenile court granted the Agency's motion to extend temporary custody.

{¶ 25} Between October 2024 and December 2024, the Agency allowed Grandmother to engage in supervised visitation with Ethan for two hours, once a week, at the Agency townhouse. The Agency indicated in its observations of the visitations that while there was an adjustment period, Ethan appeared "to be comfortable" with

Grandmother and stated that the Agency did not have any concerns during visitations. Grandmother missed only one scheduled visitation, and that was because Ethan was sick.

{¶ 26} Smith testified that visitations went "relatively well" but that there were some struggles in the beginning because Ethan experienced "stranger danger" with Grandmother.

{¶ 27} Grandmother admitted that from Ethan's birth in December 2022 until Father's May 2023 arrest (and thus prior to the commencement of Grandmother's visitation in October 2024), she saw Ethan on only four or five occasions. Grandmother testified that the visitations with Ethan "were going great" and he "was really getting comfortable with [her] again." Grandmother stated that Ethan would smile and come up to her during visitations when she would say his nickname. Ethan's paternal grandfather also attended visitations with her.

**K. Hearing and Decision on Grandmother's Motion to Intervene**

{¶ 28} On October 16, 2024, before Grandmother's second home study and around the time that her visitations with Ethan began, the magistrate held a hearing on Grandmother's motion to intervene. Grandmother testified at that hearing. Smith later testified that the Agency was concerned by Grandmother's testimony at the motion-to-intervene hearing because Grandmother did not seem to understand how Ethan was injured, the extent of his injuries, or the timeline of his injuries. The Agency was also concerned that Grandmother seemed to deflect blame from Father when she testified "that [Mother] should have been investigated criminally as well."

{¶ 29} The next day, October 17, 2024, the magistrate issued a decision denying Grandmother's motion to intervene. The magistrate found that "[Grandmother's] motion

fail[ed] on procedural ground[s]" because "Civ.R. 24(C) requires that the pleading attached to the motion be in compliance with Civ.R. 7(A)." The magistrate further noted that Grandmother filed her motion "under the existing case number," which made "the pleading a motion as opposed to a complaint." The magistrate, quoting *In re L.M.*, 2021-Ohio-1630, ¶ 25 (12th Dist.), noted that "'[a] party's failure to file a pleading in compliance with Civ.R. 24(C) is fatal to a motion to intervene.'"

{¶ 30} The magistrate further found that even if Grandmother's motion to intervene was procedurally correct, Grandmother would still have no right to intervene in the case under Civ.R. 24(A) or Civ. R. 24(B). Specifically, Grandmother's motion to intervene failed on the merits under Civ. R.24(A) because Grandmother, as a grandparent, did not have a legal interest in the case. Likewise, the magistrate concluded that Grandmother's motion to intervene failed on the merits under Civ.R. 24(B) because Grandmother did not establish that she ever "stood in loco parentis" with regard to Ethan.

{¶ 31} On the same day, the trial court adopted the magistrate's decision, making it a final appealable order. The trial court's entry adopting the magistrate's decision advised the parties of the right to appeal. Grandmother never appealed the denial of her motion to intervene.

{¶ 32} In a later-filed order, the court noted that its denial of Grandmother's motion to intervene rendered her motion for custody moot and dismissed.

**L. Grandmother's Second Home Study**

{¶ 33} In November of 2024, the Agency conducted Grandmother's second home study. This time, Grandmother and her sister, Keisha, completed the necessary background checks. However, there were new concerns.

{¶ 34} While conducting the background checks, Smith learned that Grandmother

had legal custody of her daughter's child, Zeke. The background check revealed that Zeke was an alleged child victim of physical abuse and that Zeke's biological father was the alleged perpetrator. She also learned that in July of 2024, while Zeke was in the legal custody of Grandmother, Zeke's father fled with Zeke during his unsupervised visit with Zeke, which led to a criminal pursuit with law enforcement. Pursuant to Smith's testimony, Zeke's father did not stop fleeing from police, and when the police apprehended him, Zeke's father would not put Zeke down.[3] Smith also testified to her understanding, based on Agency records, that Zeke's mother—Grandmother's daughter—is in jail for involuntary manslaughter for shooting and killing her mother-in-law for giving Zeke a haircut.

{¶ 35} As part of the second home study, the Agency completed an announced, scheduled visit to Grandmother's home in November 2024. Smith testified that during this scheduled visit she reiterated to Grandmother the importance of protecting Ethan from Father and showed Grandmother pictures of Ethan's injuries. She also showed Grandmother the five-year protection order that was in place between Ethan and Father. Smith testified that this was the first time that Grandmother had been shown the pictures of Ethan's injuries.

{¶ 36} When Smith showed the pictures of Ethan's injuries and the protection order to Grandmother, Smith testified that Grandmother did "express appropriate emotion" and cried. However, Smith testified that Grandmother also stated, "why did he have to hurt [Ethan] and why didn't he just hurt her," referring to Mother.

{¶ 37} Smith then told Grandmother that she should not have made that statement,

---

3. The transcript from the permanent custody hearing interchanges the names Zeke and Ethan when discussing how Zeke's father fled with Zeke. It appears Smith simply made a mistake in naming Ethan rather than Zeke as the child who was with Zeke's father while he was fleeing from law enforcement.

and that the injuries that Father caused should not be made on infants *nor* adults. Smith expressed how Grandmother's comment minimalized what Father did to Ethan and concerned Smith about giving custody of Ethan to Grandmother. Smith admitted that after seeing the pictures of Ethan and the protection order, Grandmother indicated she did not want Ethan to have contact with Father, but explained that later Grandmother also indicated she wanted Ethan to have a relationship with Father in the future.

{¶ 38} Grandmother had a different recollection of this exchange. Grandmother testified that she did not see pictures of Ethan's injuries and that she was only told of his injuries. Grandmother testified that she knew Ethan's injuries were serious and that she knew "he did have like a brace thing on his legs."

{¶ 39} Smith also testified that after repeated effort over time to induce Grandmother to set up Ethan's toddler bed, the toddler bed remained in its box in Grandmother's house. Grandmother, on the other hand, testified that she set up Ethan's toddler bed and had sent pictures of it to the Agency.

{¶ 40} Smith testified that there was "something off" about Grandmother, and that "there [was] something that [she] did not trust [her] gut with . . ." As a result, Smith took Ethan's case to the prosecuting attorney's office to get a fresh look of eyes on it, and to get advice. The prosecuting attorney's office suggested conducting an unannounced house visit due to the Agency's concerns about Grandmother's dishonesty and lack of protectiveness. The Agency then conducted an unannounced home visit on December 3, 2024.

{¶ 41} Smith testified that when she went to Grandmother's door to conduct the unannounced home visit, a woman that Smith had not seen before answered the door. After that woman let Smith inside the house, Smith saw that there was an "unknown male

sitting on the couch . . . holding another infant child." Zeke was at school at the time of the unannounced home visit, so this was an unidentified infant. When Smith asked who the male was in Grandmother's house, the male would not provide his identification or date of birth.

{¶ 42} Smith testified that the unidentified woman told Smith that her name was Erica and that she and the unidentified man were from Michigan but were residing in Grandmother's home until the end of the month. Smith then asked if they could complete a fingerprint and background check to be a part of the home study. Erica and the unidentified man declined to participate in the home study. Smith testified that she reached out to Grandmother to try to get identification for the man and woman, but Grandmother stated that she did not want them to be a part of the home study because they did not live at her house.

{¶ 43} Again, Grandmother's view of the unannounced visit was different from Smith's. Grandmother testified that Erica did not live at Grandmother's house but was still there "all the time" visiting her mom, Keisha, and was probably at the house even as Grandmother was testifying. Grandmother explained that Erica is a "stay-at-home mom" and that her "boyfriend drop[s] her off first thing in the morning, [sic] he will come pick her up, check on her and the baby throughout the day, and pick them up at night." Grandmother further testified that when Erica and her boyfriend "are not on the road, they [move] between [her] house and . . . her boyfriend's father's house." Grandmother also stated that Grandmother's youngest daughter is at her house "all the time." Grandmother admitted that she would get in trouble with her landlord if her landlord found out that her niece and other visitors were staying at her house for months at a time.

{¶ 44} Grandmother testified that she told Erica to provide her information to the

Agency, but Erica felt like she had nothing to do with the case. Grandmother testified that she has "no control" over Erica and that she's "not [her] child." Grandmother testified that she knew that the Agency would deny her second home study if she did not provide Erica's information to the Agency and accepted this.

{¶ 45} Smith testified that after the Agency's unannounced visit, the Agency denied Grandmother's second home study for the reasons discussed above. Agency documents in the record support Smith's testimony on this point.

{¶ 46} Despite Smith's testimony that Grandmother failed the second home study, Grandmother testified that she did not fail the second home study but passed it. Grandmother stated that she did not understand why Ethan was not placed with her.

### M. Permanent Custody Motion and Hearing

{¶ 47} Because of Grandmother's second failed home study, the Agency on December 9, 2024, filed a motion for permanent custody and stopped Grandmother's visitations with Ethan. On May 23, 2025, Father filed a motion asking the court to award legal custody of Ethan to Grandmother.

{¶ 48} On June 2, 2025, the juvenile court held the permanent custody hearing. At the beginning of the hearing, the court addressed four issues.

{¶ 49} First, the court, noting that it had denied Grandmother's motion to intervene, inquired as to the capacity in which Grandmother's counsel was participating in the permanent custody hearing. Grandmother's counsel admitted that the law "clearly does not provide a mechanism for a grandparent to intervene in this kind of case" but argued that Grandmother's custody petition, which she characterized as a "private motion for custody" or a "petition for custody" "should survive, even though she was denied permission to intervene." The court, referring to the pending permanent custody motion,

noted that "private custody proceedings, uh, basically are put on hold in favor of the dependent/neglect case," to which Grandmother's counsel stated, "I understand, Judge." The court then more specifically stated, "So, I don't think we're going to have a hearing on [Grandmother's] motion for legal custody," to which Grandmother's counsel responded, "Understood. I just wanted to make the record."

{¶ 50} Second, the court confirmed that the GAL's latest report had been filed and that the GAL recommended that permanent custody of Ethan be granted to the state.

{¶ 51} Third, the court inquired as to Mother's position regarding permanent custody. During this exchange, the court explained the consequences of losing permanent custody. Mother stated that she understood the consequences and wanted to consent to the court awarding permanent custody to the Agency. The court found that Mother knowingly, intelligently, and voluntarily gave her consent. Through counsel, Mother indicated she opposed Father's motion for legal custody of Ethan to be granted to Grandmother.

{¶ 52} Fourth, the court took judicial notice of the judgment entry of sentence for Father's conviction for his physical abuse of Ethan.

{¶ 53} The court then heard testimony. The state's only witness was Smith, and Father's only witness was Grandmother. We have addressed most of these witness' permanent custody hearing testimony relevant to this appeal above. However, Smith testified about one additional topic we have not addressed: Ethan's experience with his foster family.

{¶ 54} Smith testified that, at the time of the permanent custody hearing, Ethan was in a foster-to-adopt placement and had been there since his removal in December of 2023, and that he had been "phenomenal" and was "thriving." Smith also testified that

Ethan was "very bonded to the caregivers" and that Mother wanted Ethan to remain where he was. Smith also stated that if Ethan was to be removed from his current foster family, she believed that Ethan would regress.

{¶ 55} Smith further testified that since Grandmother was denied the second home study, Smith had not reached out to the Agency about Ethan. Grandmother admitted that she did not reach out to the Agency about Ethan but instead retained a lawyer.

**N. Juvenile Court's Decision**

{¶ 56} On June 9, 2025, the juvenile court issued a decision granting the Agency permanent custody of Ethan and denying Father's motion for legal custody of Ethan to be awarded to Grandmother. The court in its decision found that granting permanent custody to the Agency was in Ethan's best interest. In so holding, the court noted, among other things, that Ethan was doing "very well in his placement" and that Grandmother had not visited or contacted him since Thanksgiving of 2024. The juvenile court also noted that Ethan could not or should not be placed with Father within a reasonable time because Father was incarcerated for injuring Ethan.

{¶ 57} With respect to the fourth best interest factor, R.C. 2151.414(D)(1)(d), the juvenile court balanced the two options available to the court, granting permanent custody to the Agency or granting Father's motion for legal custody to be given to Grandmother. The court determined that Ethan's need for a legally secure permanent placement could not be achieved without a grant of permanent custody to the Agency because "adoption is the best chance for [Ethan] to achieve a stable family home he needs." Therefore, the juvenile court held that the Agency had proven by clear and convincing evidence that granting permanent custody of Ethan to the Agency was in Ethan's best interest and that it was not in Ethan's best interest to grant Father's legal custody motion.

**{¶ 58}** Father and Grandmother both appealed.

## II. Legal Analysis

**{¶ 59}** Father raised two assignments of error and Grandmother raised three. We will first address Grandmother's first assignment of error. We will then collectively address Father's two assignments of error and Grandmother's second and third assignments of error.

### A. Due Process and Grandmother's Motion for Legal Custody

**{¶ 60}** Grandmother's first assignment of error states:

> THE TRIAL COURT ERRED BY REFUSING TO ALLOW PATERNAL GRANDMOTHER TO PROCEED ON HER CUSTODY PETITION.

**{¶ 61}** Grandmother argues that the trial court's failure to conduct a hearing on her legal custody petition violated her right to due process. Grandmother also argues that R.C. 2151.353(A)(3) provided her a statutory right to have her legal custody motion adjudicated.

### 1. Preliminary Issue

**{¶ 62}** Before addressing Grandmother's argument about her motion for legal custody, we must address a preliminary issue: Grandmother's motion to intervene.

**{¶ 63}** As explained above, Grandmother filed a motion to intervene on the same day she filed her motion for legal custody. The juvenile court denied Grandmother's motion to intervene, and Grandmother failed to appeal that decision. In fact, at the permanent custody hearing, Grandmother's counsel admitted that the law "clearly does not provide a mechanism for a grandparent to intervene in this kind of case."

**{¶ 64}** In an entry issued after the denial of Grandmother's motion to intervene, the juvenile court noted that its denial rendered her motion for custody moot and dismissed.

Grandmother did not object to this characterization by the court. But, at the permanent custody hearing, Grandmother's counsel took a different position, arguing that her motion for legal custody was a "private motion for custody" or a "petition for custody" that "should survive, even though she was denied permission to intervene." The juvenile court, referring to the pending permanent custody motion, noted that "private custody proceedings, uh, basically are put on hold in favor of the dependent/neglect case," to which Grandmother's counsel stated, "I understand, Judge." The court then more specifically stated, "So, I don't think we're going to have a hearing on [Grandmother's] motion for legal custody," to which Grandmother's counsel responded, "Understood. I just wanted to make the record."

{¶ 65} The juvenile court never made any definitive holding on the question of whether Grandmother could pursue her legal custody motion after denial of her motion to intervene. It simply stated that "private custody proceedings" are held in abeyance during permanent custody proceedings. In effect, the juvenile court seems to have deferred ruling on the question and never directly addressed the question because it granted permanent custody to the Agency.

{¶ 66} Similarly, we conclude that we do not need to decide whether Grandmother's motion for legal custody survived the denial of her motion to intervene, or whether that denial instead rendered her motion for legal custody moot or dismissed. This is the case because, even if Grandmother's motion for legal custody did survive, it was without merit for the reasons that follow.

## 2. Analysis

{¶ 67} Grandmother argues that the juvenile court violated her due process rights when the court did not hear her legal custody motion because when she filed for legal

- 17 -

custody, R.C. 2151.353(A)(3) entitled her to a "liberty interest and procedural due process interests." Grandmother's argument is misguided. Neither procedural due process principles nor R.C. 2151.353(A)(3) entitled Grandmother to a legal custody hearing.

{¶ 68} "'The fundamental requisites of due process of law in any proceeding are notice and the opportunity to be heard.'" *In re T.L.C.*, 2023-Ohio-3929, ¶ 6 (12th Dist.) quoting *In re B.C.*, 2014-Ohio-4558, ¶ 17. "'The requirements of procedural due process only apply to protected liberty and property interests.'" *In re T.L.C.*, at ¶ 6 quoting *CT Ohio Portsmouth, L.L.C., v. Ohio Dept. of Medicaid*, 2020-Ohio-5091, ¶ 29.

{¶ 69} Grandmother argues that R.C. 2151.353(A)(3) gave her a protected liberty or property interest, and thus due process gave her a right to be heard with respect to her legal custody motion. That statute, in part, states:

> If a child is adjudicated an abused, neglected, or dependent child, the court *may* make any of the following orders of disposition: . . . [a]ward legal custody of the child to either parent to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings.

R.C. 2151.353(A)(3). The plain language of the statute says that the juvenile court "*may*" award legal custody to any person who, "prior to the dispositional hearing, filed a motion requesting legal custody . . ." (Emphasis added.) The "may" language gives a juvenile court discretion. The statute does not place a mandatory obligation on the trial court to grant legal custody or to hold a legal custody hearing for any person who files for legal custody. Instead, the statute is permissive, leaving those decisions to the trial court. Grandmother's argument based on the text of R.C. 2151.353(A)(3) is without merit.

{¶ 70} Next, Grandmother argues her family relationship to Ethan presents an interest protected by procedural due process. She is again incorrect. The requirements

of procedural due process only apply to liberty and property interests, which Grandmother does not have with respect to Ethan. The Ohio Supreme Court has explained that "[t]he law does not provide grandparents with inherent legal rights based simply on the family relationship." *In re H.W.*, 2007-Ohio-2879, ¶ 9 citing *In re Whitaker*, 36 Ohio St.3d 213, 215 (1988). And we previously held, in a case similar to this one, that "[a] child's grandparents . . . do not have a fundamental and constitutionally protected liberty interest in choosing how to manage their grandchildren, 'as that would interfere with those rights already vested in the parents.'" *In re T.L.C.*, at ¶ 7, quoting *In re Skinner*, 1994 WL 93149 (4th Dist. Mar. 23, 1994). In that case, we held that a grandmother did not have a due process right to a hearing on her motion for legal custody:

> [B]ecause the requirements of procedural due process only apply to protected liberty and property interests, something which grandparents do not inherently have with respect to their grandchildren, the principles of procedural due process did not require the juvenile court to give Grandmother an opportunity to be heard and present evidence in support of her two motions for legal custody before it could grant permanent custody of the children to WCCS.

*In re T.L.C.* at ¶ 7. Therefore, in the case before us, the juvenile court was not required to give Grandmother an opportunity to be heard and to present evidence in support of her legal custody motion before it could grant permanent custody of Ethan to the Agency.

{¶ 71} Even so, the record indicates that Grandmother did have an opportunity to be heard since she testified twice over the course of Ethan's case—once at her motion-to-intervene hearing and once at the permanent custody hearing. Her counsel was also present and participated in the permanent custody hearing. Accordingly, the juvenile court did not deny due process to Grandmother by not holding a hearing on her motion for legal custody.

{¶ 72} We overrule Grandmother's first assignment of error.

- 19 -

**B. Weight and Sufficiency of Evidence**

{¶ 73} Father's first assignment of error states:

THE COURT ERRED IN FINDING THAT IT WAS IN [ETHAN'S] BEST INTEREST FOR [THE AGENCY] TO BE AWARED PERMANENT CUSTODY WHERE IT WAS NOT PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT SUCH AN AWARD WAS IN THE CHILD'S BEST INTEREST.

{¶ 74} Father's second assignment of error states:

THE TRIAL COURT ERRED IN DETERMINING THAT [ETHAN'S] NEED FOR A LEGALLY SECURE PERMANENT PLACEMENT COULD NOT BE ACHIEVED WITHOUT A GRANT OF PERMANENT CUSTODY TO THE AGENCY WHERE IT WAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE THAT LEGAL CUSTODY SHOULD BE AWARDED TO THE PATERNAL GRANDMOTHER.

{¶ 75} Grandmother's second assignment of error states:

THE TRIAL COURT ERRED IN DETERMINING THAT [ETHAN'S] NEED FOR A LEGALLY SECURE PLACEMENT COULD NOT BE ACHIEVED WITHOUT A PERMANENT GRANT OF CUSTODY TO THE [AGENCY].

{¶ 76} Grandmother's third assignment of error states:

THE TRIAL COURT ERRED IN DETERMINING THAT IT WAS IN [ETHAN'S] BEST INTEREST TO AWARD PERMANENT CUSTODY TO THE [AGENCY] INSTEAD OF AN APPROPRIATE FAMILY MEMBER.

{¶ 77} In support of these assignments of error, Father and Grandmother both argue that the juvenile court's permanent custody decision was not supported by clear and convincing evidence and was against the manifest weight of the evidence. As a reminder, we note that whether or not Grandmother's motion for legal custody was properly before the juvenile court at the time of the permanent custody hearing, Father had also filed a motion asking the court to award legal custody of Ethan to Grandmother, and the juvenile court considered the question of whether legal custody to Grandmother

was in Ethan's best interest as part of its larger best interest analysis. We will do the same.

**1. Applicable Law and Standards of Review**

{¶ 78} "Before a natural parent's constitutionally protected liberty interest in the care and custody of [their] child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met." *In re M.G.*, 2023-Ohio-1316, ¶ 44 (12th Dist.); R.C. 2151.414(E). "Under R.C. 2151.414(B)(1), the juvenile court may terminate the parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test." *In re N.L.*, 2025-Ohio-2625, ¶ 20, (12th Dist.), citing *In re K.P.*, 2022-Ohio-1347, ¶ 17 (12th Dist.). "First, R.C. 2151.414(B)(1) provides that the juvenile court must find that the grant of permanent custody to the agency is in the 'best interests' of the child." *In re N.L.*, at ¶ 20, (12th Dist.), citing *In re M.H.*, 2022-Ohio-48, ¶ 35 (12th Dist.). "Second, the juvenile court must find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) apply." *In re R.C.*, 2025-Ohio-5150, ¶ 52 (12th Dist.), citing *In re R.B.*, 2022-Ohio-1705, ¶ 31(12th Dist.). Those circumstances include, but are not limited to: (1) the child is abandoned, R.C. 2151.414(B)(1)(b); (2) the child is orphaned, R.C. 2151.414(B)(1)(c); (3) the child has been in temporary custody of one or more public children service agencies for 12 of more months of a consecutive 22-month period, R.C. 2151.414(B)(1)(d); (4) the child has been removed from the parents' custody or been adjudicated as abused, neglected, or dependent on three separate occasions, R.C. 2151.414(B)(1)(e); and (5) the circumstances described in R.C. 2151.414(B)(1)(b), (c), (d), and (e) do not apply and the child cannot be placed with either the child's parents within a reasonable time or should not be placed with the parents, R.C. 2151.414(B)(1)(a).

*In re J.B.*, 2023-Ohio-2454, ¶ 13 (12th Dist.). Only one of these circumstances need to apply to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 2020-Ohio-4414, ¶ 16 (12th Dist.).

{¶ 79} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re A.S.*, 2020-Ohio-4127, ¶ 19 (12th Dist.). However, "[e]ven if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence." *In re G.A.*, 2023-Ohio-643, ¶ 18 (12th Dist.), citing *In re F.S.*, 2021-Ohio-345, ¶ 61 (12th Dist.). In determining whether a juvenile court's judgment is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence favors the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 2021-Ohio-3074, ¶ 15 (12th Dist.). Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it the interpretation that is consistent with the verdict and judgment. *In re D.S.*, 2022-Ohio-998, ¶ 63 (12th Dist.).

### 2. First Part of Permanent Custody Test: Best Interest Analysis

{¶ 80} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, a juvenile court must consider all relevant factors,

including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . .;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in division (E)(7) to (11) of this section apply in relation to the parents and child.

A juvenile court may also consider any other factors it deems relevant to the child's best interest. *In re A.J.*, 2019-Ohio-593, ¶ 24 (12th Dist.).

{¶ 81} In this case, the juvenile court thoroughly evaluated each of the best interest factors outlined in R.C. 2151.414(D) and concluded that granting permanent custody of Ethan to the Agency was in his best interest. Upon review, we find the juvenile court did not err.

{¶ 82} As to the first best-interest factor—that is, the interaction and relationship of the child with his parents, foster caregivers, and others, R.C. 2151.414(D)(1)(a)—the record demonstrates that Ethan has spent most of his life—nearly all of it since he was four months old—with the same foster family and has bonded well with them. The foster family is also a "foster-to-adopt" family which indicates that there is a possibility for Ethan to be adopted. Mother indicated that she did not bond well with Ethan but that she wanted

him to be in foster care, and to stay in his current placement. Father is incarcerated because of the physical abuse that he inflicted on Ethan.

{¶ 83} Although Grandmother's visits with Ethan went relatively well, the record indicates that she only had visitation with Ethan for a short time of two hours a week for about two months, and she had very little contact with Ethan prior to the visitation period. Grandmother failed both of her home studies. The evidence in the record supports the Agency's concerns over her trustworthiness and lack of protectiveness with regard to Ethan. The juvenile court could reasonably conclude that Grandmother's conflicting testimony at the permanent custody hearing—for example, that she did in fact pass her first home study, and that Smith did not show her the pictures of Ethan's injuries—weighed against her trustworthiness.

{¶ 84} Furthermore, Grandmother allows multiple individuals to live or stay in her home, and the juvenile court could conclude based on the evidence presented at the permanent custody hearing that she was unwilling or uncooperative in providing information about those individuals the Agency needed to determine if Grandmother's home was safe for Ethan. This is particularly troubling considering the significant history of physical abuse and other criminal behavior among Grandmother's family and/or those living in or visiting her home. On balance, we find that the first best-interest factor favors an award of permanent custody to the Agency.

{¶ 85} As to the second best-interest factor—the wishes of the child, R.C. 2151.414(D)(1)(b)—Ethan was too young to express his wishes, being only two and a half years old at the permanent custody hearing. The GAL recommended in her report and at the permanent custody hearing that Father's motion for legal custody of Ethan to go to Grandmother should be denied, and that permanent custody of Ethan should be

granted to the Agency. The GAL indicated in her report that Ethan had bonded with his foster family and that he was doing well. The GAL also shared concerns that Ethan would regress if he were to be removed from his foster family.

{¶ 86} The record indicates that Mother also opposed Father's motion for legal custody of Ethan to go to Grandmother, and desired for the Agency to have permanent custody of Ethan. Mother recognized that Ethan had bonded well with his foster family and realized that the foster family was a better situation for him. For these reasons, the second best-interest factor favors an award of permanent custody to the Agency.

{¶ 87} As to the third best-interest factor—the custodial history of the child, R.C. 2151.414(D)(1)(c)—Ethan has been in the Agency's temporary custody since November of 2023. Moreover, he has lived with his foster family for nearly all of his life, since he was just four months old. (Given his young age, he may not even remember who Grandmother is.) Therefore, the third best interest factor favors an award of permanent custody to the Agency.

{¶ 88} As to the fourth best-interest factor—the child's need for a legally secure permanent placement, R.C. 2151.414(D)(1)(d)—the record demonstrates neither Father nor Grandmother can provide such a placement for Ethan. Father, of course, is incarcerated for the violent acts he performed that caused Ethan serious physical injuries, and he will be in prison until 2031. And, of course, it was Father who criminally injured Ethan.

{¶ 89} For Grandmother, it is a closer call. Grandmother does have a stable job and secure housing. Grandmother can also provide health insurance and has bonded with Ethan during visitation. However, Grandmother's testimony and actions indicate that Grandmother's ability to provide a legally secure placement for Ethan is highly

questionable.

{¶ 90} As stated above, Grandmother's home features a stream of guests or residents, coming and going, several of whom did not identify themselves to the Agency. Evidence supports the conclusion that Grandmother failed to fully cooperate in providing the Agency with information about these individuals. Grandmother stated that she did not need to provide their information to the Agency because they did not officially live at her house, but Grandmother also testified that they were always over and even indicated that Erica was probably at her house while she was testifying.

{¶ 91} Grandmother's failure to prioritize providing information the Agency needed is particularly troublesome considering the history of criminal behavior among individuals in Grandmother's household. In fact, the grandchild of whom Grandmother does have legal custody, Zeke, was put in serious danger by his father while living in Grandmother's house. Moreover, Smith testified that Grandmother, upon looking over the pictures of Ethan's injuries, stated, "why did [Father] have to hurt [Ethan] and why didn't he just hurt [Mother]." The juvenile court could conclude that this somewhat cavalier statement about violence, when combined with the Agency's concerns about Grandmother's lack of appreciation for the seriousness of Father's violence against Ethan, suggested she was unlikely to provide a legally secure permanent placement.

{¶ 92} In contrast to the uncertainty in the record regarding Grandmother's ability to provide a legally secure permanent placement, Ethan has been in the same foster care placement for most of his life. Throughout his time in his foster care placement, there have been no incidents that have caused concern about Ethan or his safety. In fact, the record demonstrates that he has done "phenomenal[ly]" in his placement and has bonded well with his foster family.

{¶ 93} We also note that Grandmother heavily relies on two Ohio First District Court of Appeals cases in support of her argument that the trial court erred in granting permanent custody to the Agency. Those cases are *In re A.H.*, 2025-Ohio-2708 (1st Dist.), and *In re B.J.*, 2021-Ohio-373 (1st Dist.). In both of those cases, the First District overturned the juvenile court's decisions granting permanent custody to the Agency where there was evidence that a relative had an approved home study and had filed for legal custody. But here, to Grandmother's detriment, she did *not* have an approved home study, but failed two. Therefore, *A.H.* and *B.J.* are distinguishable and do not support Grandmother's arguments.

{¶ 94} On balance, we find that the fourth best-interest factor favors the Agency receiving permanent custody.

{¶ 95} As a result of the foregoing, we conclude that the juvenile court did not err in finding the best interest factors weighed in favor of awarding permanent custody to the Agency. There is sufficient credible evidence to support the juvenile court's determination, and the juvenile court's determination is not against the manifest wright of the evidence.

**3. The Second Part of the Permanent Custody Test**

{¶ 96} As mentioned above, the juvenile court found that three of the circumstances under the second prong of the permanent custody test were met. Specifically, the court found that: (1) Ethan had been in the Agency's custody for at least 12 of the last 22 months (referencing the "12 of 22" circumstance described in R.C. 2151.414[B][1][d]); (2) Father abandoned Ethan (referencing the "abandonment" circumstance described in R.C. 2151.414[B][1][b]); and (3) Ethan could not or should not be placed with either Mother or Father in a reasonable time (referencing the "reasonable time" circumstance described in R.C. 2151.414[B][1][a]).

{¶ 97} On appeal, Father does not challenge the juvenile court's "12 of 22" finding. Because Father does not challenge "12 of 22" finding, we do not need to review that finding. *In re Z.B.*, 2024-Ohio-5387, ¶ 32 (12th Dist.). However, we note that the record unquestionably establishes that the "12 of 22" finding was met because Ethan was placed in temporary custody of the Agency in November of 2023, was adjudicated abused and dependent in January of 2024, and remained in the Agency's custody through the date the Agency filed for permanent custody in December of 2024. Because only one of the R.C. 2151.414(B)(1)(a) to (e) findings must be met to satisfy the second prong of the two-part permanent custody test, we need not review the juvenile court's "abandonment" or "reasonable time" findings. *In re R.B.*, 2023-Ohio-3145, ¶ 51, citing *In re J.N.L.H.*, 2022-Ohio-3865, ¶ 26 (12th Dist.). As such, the state satisfied the second prong of the permanent custody test.

{¶ 98} Considering the foregoing, we conclude that the juvenile court's decision was supported by sufficient evidence and not against the manifest weight of the evidence. Therefore, we overrule Father's first and second assignments of error, and Grandmother's second and third assignments of error.

### III. Conclusion

{¶ 99} We conclude that the juvenile court did not err by determining that it was in Ethan's best interest to grant permanent custody to the Agency. The juvenile court's permanent custody decision was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Furthermore, the trial court did not violate Grandmother's due process rights in not holding a legal custody hearing. Thus, we overrule Grandmother's first, second, and third assignments of error, and we also overrule Father's first and second assignments of error.

{¶ 100}    Judgment affirmed.


HENDRICKSON, P.J., and SIEBERT, J., concur.


## J U D G M E N T   E N T R Y


The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.


/s/ Robert A. Hendrickson, Presiding Judge


/s/ Matthew R. Byrne, Judge


/s/ Melena S. Siebert, Judge